In re STRUCTURLITE PLASTICS CORPORATION, Debtor.

Bankruptcy Nos. 2–88–01236, 31–4371524.

United States Bankruptcy Court, S.D. Ohio, E.D.

May 16, 1988.

Reginald W. Jackson, Patricia M. Scanlon, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for debtor.

Thomas R. Noland, Altick & Corwin, Dayton, Ohio, for Official Unsecured Creditors' Committee.

Charles M. Caldwell, Columbus, Ohio, Asst. U.S. trustee.

## AMENDED OPINION AND ORDER DENYING MOTION FOR AUTHORITY TO ASSUME EXECUTORY CONTRACT AND TO PAY PRE–PETITION MEDICAL CLAIMS

R. GUY COLE, Jr., Bankruptcy Judge.

### I. *Preliminary Statement*

This matter is before the Court upon the Motion for Authority to Assume Executory Contract and to Pay Pre–Petition Medical Claims ("Motion") filed by Structurlite Plastics Corporation, the debtor and debtor-in-possession ("Debtor") in this Chapter 11 case. The official Committee of Creditors ("Committee") objected to the Motion and an expedited hearing was scheduled for March 28, 1988. Pursuant to an agreement by the parties, the hearing was rescheduled for, and held, on April 7, 1988. Following the hearing, at which counsel ably presented their respective positions, the parties filed post-hearing briefs. Upon receipt of the briefs, the record was closed and the matter was taken under advisement.

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding which the Court may hear and determine. 28 U.S.C. § 157(b)(1), and (2)(A). The following opinion shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule ("B.R.") 7052.

### II. *Factual Background*

Structurlite Plastics Corporation ("Structurlite") is a manufacturer of lightweight structural plastic products whose principal place of business is located in Hebron, Ohio. On March 8, 1988, Structurlite commenced a case under Chapter 11 of the Bankruptcy Code by filing a petition with this Court. As of the petition date, Structurlite was party to a collective bargaining agreement with Local 618 of the United Rubber, Cork, Linoleum and Plastic Workers of America (the "Union"). Pursuant to the collective bargaining agreement, Structurlite is obligated to provide certain health, disability and life insurance benefits to its hourly employees.[1] Structurlite likewise provides such benefits to its non-union, salaried employees. The Debtor's provision of benefits to its employees was effectuated through the establishment of

---

1. Article XXIII of the collective bargaining agreement provides in pertinent part as follows:
 "(a) The Company agrees to continue for the duration of this Agreement the program of life, health and accident and major medical plan insurance for all eligible employees."

the Structurlite Plastics Employee Benefit Trust (the "Trust"). The Trust was established pursuant to an Agreement of Trust ("Trust Agreement") executed by and between Structurlite and Robert E. Griffith, Larry B. Cox and J. Richard Carter on October 1, 1979, the original trustees of the Trust. Current trustees of the Trust are George Levy, president of Structurlite; Larry Luke, Structurlite's secretary/treasurer; and Richard Sex, Structurlite's controller (the "Trustees").

The cost involved in providing benefits to its employees and their dependents is self-funded by the Debtor. The Trust Agreement serves as the funding mechanism. Structurlite contributes such sums to the Trust as are necessary to defray the cost of providing health, disability and life insurance benefits to its employees. The fund created by such contributions is held in trust by the Trustees and later distributed to benefits claimants. The amount of Structurlite's periodic contributions to the Trust is determined by the Trustees after consultation with Employee Benefit Management Corp. ("EBMC"), the third-party administrator of the Trust. Under its Claims/Administrative Service Agreement with Structurlite, and in return for a monthly administration fee, EBMC processes and pays all claims for benefits made by employees of the Debtor. EBMC also provides the consulting and actuarial services necessary for the continued operation of Structurlite's benefits program. The Trustees are empowered to enter into insurance contracts with insurers of their choosing in order to facilitate the payment of benefits to Structurlite employees. According to Paul Hornbuckle, Structurlite's Plant Manager, the Trustees entered into a pre-petition insurance contract for the extension of accident, death and stop-loss coverage to its employees with Paul Revere Life.

A complete listing of the amounts which are owed the Trustees by Structurlite under the Trust Agreement for pre-petition employee health claims is set forth below:

| | |
|---|---|
| $53,059.59 | Pre-petition claims approved by EBMC |
| $10,221.80 | Pre-petition claims yet to be submitted to EBMC |
| 696.14 | Pre-petition claims under review by EBMC |
| 212.71 | Pre-petition administration fee of EBMC |
| 829.57 | Pre-petition accident, death and stop-loss insurance premium owed Paul Revere Life |
| $65,019.81 | Total |

Hornbuckle and Roger Helmondollar, President of Local 618 of the Union, both testified that, in their opinion, if the pre-petition health claims were not paid, there would be an adverse effect upon Structurlite's operations due to a decline in employee morale. The evidence established that several employees of Structurlite are currently faced with large medical debts resulting from catastrophic illnesses of their covered dependents. Many of the Debtor's hourly and salaried employees have outstanding obligations to medical providers. Those providers are now looking to the employees for payment of such obligations. Absent the requested funding, these employees will be subjected to collection action by such providers and will be required, where financially able, to satisfy these obligations personally. It is this threat of personal exposure for medical obligations, which would otherwise be covered by Structurlite's benefits program, that is causing employee unrest and will lead to a dramatic decline in productivity unless the Motion is granted.

In addition, Hornbuckle opined that the Debtor's failure to pay pre-petition employee medical claims would constitute a breach of Structurlite's collective bargaining agreement, which could conceivably result in a strike, or some other concerted action, by the Union. Helmondollar likewise suggested the possibility of a strike by Structurlite's employees, stating that there had been discussions of a strike among employees in the event Structurlite failed, or was unable, to pay the subject pre-petition medical claims.

### III. *Discussion*

#### A. Introduction

 Structurlite seeks authority of this Court to pay the pre-petition medical claims of its employees in the amount of $65,019.81.[2] Structurlite contends that the Trust Agreement is an executory contract which may be assumed upon satisfaction of the requirements of 11 U.S.C. § 365(b)(1)[3] and the "business judgment" test.[4] Alternatively, Structurlite submits that, assuming *arguendo* that the Trust Agreement is not an executory contract, the Court, nevertheless, has the authority to permit the payment of the pre-petition medical claims pursuant to §§ 105 and 507(a)(4) of the Bankruptcy Code. Debtor contends that payment of the pre-petition medical claims would be in the best interest of the bankruptcy estate because such payment would avert potential difficulties with the Union ranging from a decline in productivity to an actual strike. The Committee argues that the Trust Agreement is not an executory contract within the meaning of § 365. Moreover, the Committee asserts that it would be inappropriate to authorize the payment of the medical claims under authority of either § 105 or § 507(a)(4) of the Code.

Resolution of the matter at bar requires an analysis of two distinct legal issues:

1. Is the Trust Agreement an executory contract that is capable of assumption in accordance with 11 U.S.C. § 365; and

2. Assuming the Trust Agreement does not constitute an executory contract, is it appropriate for the Court to authorize payment of the medical claims pursuant to § 105 and/or § 507(a)(4)?

The Court shall examine each of these issues below.

#### B. Executory Nature of the Trust Agreement

Development of a working definition of an executory contract for purposes of applying § 365 of the Code has proven to be a problematic task. As one bankruptcy court has noted, "[m]uch of the confusion surrounding the executory contract concept in bankruptcy has been caused by attempted definitions of what Congress has steadfastly refused to define." *In re Norquist*, 43 B.R. 224, 225 (Bankr.E.D.Wash.1984). A number of different approaches to the formulation of a definition of an executory contract have arisen from the case law.

A definition of an executory contract which has gained wide, yet not universal, acceptance is that offered by Harvard Law Professor Countryman, a draftsman of the Code and a well-known bankruptcy commentator. Countryman posits that a contract is executory for purposes of applying § 365 if the "obligation[s] of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 Minn.L.Rev. 439, 460 (1973). The Countryman definition has been applied by a number of courts within this Circuit. *See, e.g., In re Fashion Two Twenty, Inc.*, 16 B.R. 784, 786 (Bankr.N.D.Ohio 1982); *In re Pesce Baking Co., Inc.*, 43 B.R. 949, 957 (Bankr.N.D.Ohio 1984); *Matter of Executive Technology Data Systems*, 79 B.R. 276, 280–81 n. 5 (Bankr.E.D.Mich.1987). The Countryman approach appears to be an

**2.** As noted above, included within this $65,019.81 sum, in addition to pre-petition medical claims, are unpaid fees to EBMC, as well as the unpaid insurance premium owing to Paul Revere Life.

**3.** Section 365(b)(1) requires that, before an executory contract may be assumed, any existing default under the contract must be promptly cured and adequate assurance of future performance under the contract must be provided.

**4.** In order to assume an executory contract under § 365, a debtor must satisfy the "business judgment" test—*i.e.*, it must be established that assumption represents a sound business judgment on the part of the debtor. *See, Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R. Co.*, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943); *Matter of Minges*, 602 F.2d 38, 42–43 (2d Cir.1979); *Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 495 (Bankr.S.D.Ohio 1982); *In re Carey Transp., Inc.*, 72 B.R. 767 (Bankr.S.D.N.Y.).

attempt to narrow the more broad historical definition of an executory contract formulated by Professor Williston, who suggested that "all contracts to a greater or less extent are executory. When they cease to be so they cease to be contracts." 1 S. Williston, *Contracts* § 14 (3d ed. 1957). There is, however, wide acceptance of the opinion that Professor Williston's definition is too broad to be effectively applied in a bankruptcy setting. *See, e.g., In re Norquist,* 43 B.R. at 225; *Collier on Bankruptcy* ¶ 365.01 at 365–11 to 365–13 (15th ed. 1987).

The Countryman definition is also considerably more narrow than the executory contract definition contained in the legislative history to the Code, which was recently cited by the Supreme Court in *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed. 482 (1984). In *Bildisco,* the Supreme Court, noting the absence of any attempt by Congress to define "executory contract," stated as follows:

> The Bankruptcy Code furnishes no express definition of an executory contract, *see* 11 U.S.C. Sec. 365(a) (1982 ed.), but *the legislative history of Sec. 365(a) indicates that Congress intended the term to mean a contract "on which performance remains due to some extent on both sides."* H.R.Rep. No. 95–595, p. 347 (1977); S.Rep. No. 95–989, p. 58 (1978).

465 U.S. at 522 n. 6, 104 S.Ct. at 1194 n. 6 (emphasis added). Countryman's definition is clearly an attempt to provide a more workable definition than the one furnished by Congress and applied in *Bildisco.*

The Sixth Circuit has formulated its own definition, founded, in part, on an earlier version of the legislative history to § 365 (a 1975 Senate Report) than that cited in *Bildisco. See, In re Becknell & Crace Coal Co., Inc.,* 761 F.2d 319 (6th Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). In *Becknell & Crace,* the Sixth Circuit defined the term as follows:

> "[E]xecutory contracts involve obligations which continue into the future. S.Rep. No. 94–458, 94th Congress, 1st Sess. (1975). They include leases, employment contracts and agreements to buy or sell in the future. Generally they are agreements which include an obligation to do something in the future."

761 F.2d at 322, citing *In re Jolly,* 574 F.2d 349, 350–51 (6th Cir.), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

Although the Sixth Circuit defined an executory contract along traditional lines in *Becknell & Crace—i.e.,* as a contract involving "obligations which continue into the future," in its earlier *Jolly* decision (which was decided under the Bankruptcy Act of 1898), the Sixth Circuit articulated a somewhat novel approach to defining executory contracts. Noting the limitations of the Countryman definition, the Sixth Circuit stated:

> Such definitions are helpful, but do not resolve this problem. The key, it seems, to deciphering the meaning of the executory contract rejection provisions is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act.

*In re Jolly,* 574 F.2d at 351. Thus, while the Sixth Circuit has employed the traditional definition of an executory contract enunciated in the legislative history and refined by Countryman, it has also applied a practical, or "functional," approach (*See,* Discussion, *infra* at 928) in its determination of whether or not a contract is executory in a rejection context.

As the discussion above illustrates, a variety of approaches to defining an executory contract for purposes of applying § 365 have emerged from the reported decisions. While the definitional methodologies clearly differ from court to court, most courts agree that where the only remaining performance to be rendered by a party to an agreement is the payment of money the contract is not deemed to be executory within the meaning of § 365.

*See,* H.Rep. No. 595, 95th Cong., 2d Sess. 347–48, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6303–04; *Lubrizol Enterprises v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043 (4th Cir. 1985), *cert. denied sub nom., Lubrizol Enterprises v. Canfield,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *In re Smith Jones, Inc.,* 26 B.R. 289, 292 (Bankr. D.Minn.1982); *In re Norquist,* 43 B.R. at 228 n. 2; *In re Placid Oil Co.,* 72 B.R. 135, 138 (Bankr.N.D.Tex.1987); *In re Wisconsin Barge Line, Inc.,* 76 B.R. 695, 697 (Bankr.E.D.Mo.1987). *Cf., In re Becknell & Crace Coal Co., Inc.,* 761 F.2d at 322. The *Norquist* court stated this well-established rule in the following manner:

> [C]ontracts historically not treated as executory are those which evidence an unpaid debt. Thus, when the debtor owes a creditor $100.00 whether the debt is secured or unsecured, it is not an executory contract and the creditor is left with his right to file a claim against the estate. Likewise, when the debtor is owed money by another the debtor has a claim against that individual, but it is not treated as an executory contract. *Such contracts have never been treated as executory for bankruptcy purposes and their treatment as such would only cause procedural problems which might perpetrate inequities among creditors.*

43 B.R. at 228 n. 2 (emphasis added). *See also, Jenson v. Continental Financial Corp.,* 591 F.2d 477, 481 n. 5 (8th Cir.1979).

■ A thorough analysis of the Trust Agreement reveals that it is not an executory contract within the meaning of the Bankruptcy Code. Under the Trust Agreement, Structurlite's only significant obligation is the funding of the Trust. Simply put, Structurlite is required to make contributions to the Trustees in amounts necessary to cover the costs incurred by the Trustees in paying Structurlite's employee benefit claims. The precise amount of the Debtor's contributions to the Trust is apparently determined by EBMC upon its review of medical claims filed by Structurlite employees during a designated time period.

In short, the Trust Agreement imposes upon the Debtor the obligation of making payments to the Trust in amounts sufficient to liquidate previously-incurred employee medical expenses. Such self-funding arrangements, involving only the duty to pay money, have been recognized as non-executory by other courts. *See, e.g., In re Placid Oil Co.,* 72 B.R. at 137–40; *In re Wisconsin Barge Line, Inc.,* 76 B.R. at 697.

The *Placid Oil* case involved a factual setting very similar to that of the case *sub judice.* In *Placid Oil,* the debtor entered into a payment arrangement with American Independent Underwriters Corp. ("AIU") to effectuate its self-insurance program. Pursuant to the arrangement, AIU undertook the responsibility for the adjustment and payment of claims made by third parties against the debtor. The terms of the arrangement between the debtor and AIU were embodied in a "Premium Agreement," which set forth a detailed method for the determination of premium payments due AIU from the debtor. The periodic premiums payable to AIU were based on the amount of insured claims finally paid by AIU to third-party claimants. Also, a fund was provided AIU for the payment of claims which was to be replenished from time to time by the debtor. The debtor made regular payments to AIU based upon estimates of monthly fees and expenses owed AIU and an estimate of all payments to be made by AIU on third-party claims. Adjustments were periodically made under the Premium Agreement so that net payments received by AIU from the debtor equaled the sum of monthly fees and expenses plus the amount of claims actually paid. In denying AIU's motion for an order compelling the debtor to assume or reject the Premium Agreement, the *Placid Oil* court focused on the reciprocal nature of the parties' obligations, or lack thereof, in ruling that the agreement was not executory. The court stated:

> Conspicuously absent from the Premium Agreement is any reference to obligations of the Debtor other than the payment terms outlined above.... The

evidence does not support the conclusion that the Debtor was in any way bound to participate or to take responsibility for the handling of any claims.... The evidence before the court shows that the Debtor's obligation under the Premium Agreement was limited to payment as described above.

. . . .

The common element of all executory contracts appears to have been defined as reciprocal obligations between the parties.

. . . .

Absent in this case is the reciprocal nature of the obligations. *The Debtor's only duty under the Premium Agreement is to pay money, which cannot alone suffice as a matter of law. Lubrizol Enterprises* [756 F.2d at 1046].

72 B.R. at 137–38 (emphasis added). *See also, In re Wisconsin Barge Line, Inc.,* 76 B.R. at 697.

The rationale of the *Placid Oil* decision is equally applicable here. Like the Premium Agreement at issue in *Placid Oil,* the subject Trust Agreement imposes no future duties upon the Debtor other than payment. Application of the well-established rule discussed in *Placid Oil*—that an agreement imposing no duty of future performance other than payment of money is not an executory contract within the meaning of § 365—leads to the inescapable conclusion that the Trust Agreement is non-executory.

The Debtor submits further that the Court should employ a "functional approach" in determining whether the Trust Agreement constitutes an executory contract. Such an approach, which focuses on the purposes to be served by assumption or rejection, has been followed by several courts, including the Sixth Circuit. *See, In re Jolly,* 574 F.2d at 351; *In re Booth,* 19 B.R. 53, 56 (Bankr.D.Utah 1982); *In re Norquist,* 43 B.R. at 225; *In re Arrow Air, Inc.,* 60 B.R. 117, 120–22 (Bankr.S.D.Fla. 1986). The functional approach was described by the court in *Arrow Air* as follows:

[U]nder the functional approach the purpose for allowing the debtor in possession to reject or assume an executory contract "is to enable ... a troubled debtor to take advantage of a contract that will benefit the estate by assuming it or alternatively, to relieve the estate of a burdensome contract by rejecting it." [quoting *In re Norquist,* 43 B.R. at 25].

Thus, even though there may be material obligations outstanding on the part of only one of the parties to the contract, it may nevertheless be deemed executory under the functional approach if its assumption or rejection will ultimately benefit the estate and its creditors.

60 B.R. at 122. As the above excerpt from *Arrow Air* indicates, the functional approach is essentially a result-oriented process, looking first to the relative benefits and burdens to the estate of assumption or rejection, and then reasoning backward to a determination as to the executory nature of the contract in question.

The Court does not believe that a different result would obtain in the instant case if the so-called functional approach to defining an executory contract is applied. The Debtor contends that assumption, which would require full payment of the pre-petition medical claims, would benefit the estate by boosting the morale of the work force, thereby ensuring that productivity will not decline and that a strike will not ensue. While the avoidance of potential labor unrest would benefit the Debtor, the Court cannot conclude, on the record before it, that the benefit to the estate and its creditors of assumption would outweigh the detriment to the estate and the creditor body resulting from full payment of the pre-petition medical claims at this stage of the case. In sum, whether the traditional or functional approach to defining executory contracts is utilized, the same conclusion is reached: The Trust Agreement is not an executory contract that is subject to assumption by Structurlite.[5]

---

5. The Court believes that if assumption of the Trust Agreement by the Debtor were authorized, the long-standing rule precluding the partial assumption or rejection of executory contracts

C. Payment of the Pre–Petition Medical Claims

▇ Structurlite contends that, even if the Trust Agreement is held to be non-assumable under § 365, the Court may nevertheless authorize the payment of the pre-petition medical claims, either under the Court's general equitable powers contained in § 105(a) of the Code or pursuant to 11 U.S.C. § 507(a)(4). Conversely, the Committee asserts that the Court is not empowered to authorize the Debtor to pay the pre-petition medical claims. The Committee argues that to grant the Debtor's Motion would disregard the priority scheme delineated in § 507 of the Code and would effectively eviscerate the long-standing principle that all general unsecured creditors are entitled to share equally in distributions from the estate.

Authority for the position advanced by the Debtor may be found in the case of *In re Chateaugay Corp.*, 80 B.R. 279 (S.D.N.Y.1987). In *Chateaugay*, the district court approved[6] Judge Lifland's order (the "Order") authorizing LTV Corporation ("LTV") to continue payment of pre-petition wages, salaries, employee reimbursement expenses and benefits, including payments on workers' compensation claims accruing prior to the petition date. The bankruptcy court stated that the Order was consistent with

LTV's business imperatives. LTV made the business decision to cease payment of workers' compensation claims in states in which it believed that private insurance, or a state fund, would cover LTV's employee-claimants. LTV continued workers' compensation payments in other states where it determined that retention of its self-insured status was economically preferable. The State of Michigan, Bureau of Workers' Disability Compensation, and Self–Insurers' Security Fund ("Michigan") appealed the Order, arguing that the bankruptcy court erred by not requiring the debtors to treat all pre-petition workers' compensation claims alike.

Michigan submitted that Judge Lifland's Order was invalid, making the following legal arguments: (1) all distributions in a Chapter 11 proceeding must be made in accordance with the priority scheme established by § 507; (2) all members of a class of claims under § 1122 must be treated in the same manner throughout the bankruptcy proceeding if a distribution is made under § 507; and (3) claims can only be disallowed for the reasons articulated in § 502(b), which does not contemplate disallowance on a state-by-state basis. In response, LTV contended that the bankruptcy court possessed the broad equitable power to enter the Order. Further, LTV

would be violated. It is well-established that an executory contract must be assumed or rejected in its entirety. *See, Richmond Leasing v. Capital Bank, N.A.,* 762 F.2d 1303 (5th Cir.1985); *In re LHD Realty Corp.,* 20 B.R. 717 (Bankr.S.D. Ind.1982); *In re Holland Enterprises, Inc.,* 25 B.R. 301 (Bankr.E.D.N.C.1982); *In re Mellen,* 79 B.R. 385, 387 (Bankr.N.D.Ill.1987). While the Trust Agreement constitutes a separate contract in the technical legal sense, it is essentially a payment mechanism. Put differently, the Trust Agreement merely facilitates one aspect of the overall collective bargaining agreement—*i.e.,* the provision of medical benefits to Structurlite's employees. It is the collective bargaining agreement, as opposed to the Trust Agreement, which imposes upon the Debtor the continuing duty to fund a benefit plan for its employees. *See* footnote 1 *supra.* Indeed, Article IX of the Trust Agreement appears to provide that the Trust Agreement is terminable at will. Query whether Structurlite's employees could rely on the Trust Agreement to insist upon the continued provision of benefits upon expiration of the underlying collective bargaining agreement?

Viewing the Trust Agreement in this light, *i.e.,* as merely a component part of the underlying collective bargaining agreement, the Court believes that it would frustrate the rule which requires a debtor to assume or reject an executory contract in its entirety were it to authorize assumption of the Trust Agreement in this case.

**6.** At the hearing, the Court suggested that the *Chateaugay* and *In re FCX, Inc., infra,* decisions might provide some authority, albeit conflicting, concerning the issues presented by the Motion. As might be expected, each party has cited, and urged application of, the particular decision which favors their respective side. Although the *Chateaugay* court's decision is apposite, its holding is a very narrow one. The court ruled that Judge Lifland's Order authorizing the payment of pre-petition indebtedness was not appealable and that leave to appeal should not be granted. The *Chateaugay* court proceeded to consider, in *dicta,* the substantive question of the permissibility of authorizing payment of pre-petition claims outside the context of a plan of reorganization.

argued that: (1) even if the payments to workers compensation claimants were a distribution, § 507 priorities are not inflexible; and (2) the appropriateness of claim classification is an issue ripe only at the plan stage of the bankruptcy proceeding. *Id.* at 286.

The *Chateaugay* court, in approving Judge Lifland's Order, stated as follows:

A rigid application of the priorities of § 507 would be inconsistent with the fundamental purpose of reorganization and of the Act's grant of equity powers to bankruptcy courts, which is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately. The Supreme Court has emphasized the special nature of reorganization proceedings.

It is a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised and to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile.

*Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry.*, 294 U.S. 648, 676, 55 S.Ct. 595, 606, 79 L.Ed. 1110 (1935). In this case, a restrictive interpretation of § 507 or of the powers accorded the bankruptcy court judge would similarly defeat the very end of Chapter 11 petitions.

80 B.R. at 287. The court also rejected Michigan's classification argument, stating that § 1122's requirements govern only the question of plan confirmability and do not mandate equality of treatment among class members at all phases of a bankruptcy proceeding. *Id.* at 288. Finally, the court found that Michigan's contention that the Order violated § 502(b) was not sustainable, stating that LTV's failure to pay the Michigan claimants at the pre-plan juncture of the case did not constitute "disallowance" of their claims within the meaning of that subsection. *Id.* at 288–89. *See also, In re Penn Central Transportation Co.*, 452 F.2d 1107 (3d Cir.1971) (holding that

*pro rata* participation among administrative expense claimants does not necessarily require simultaneous participation. "To so hold would unduly impair the flexibility so essential to a reorganization proceeding."); *In re Boston and Maine Corp.*, 719 F.2d 493 (1st Cir.1983) (requirement that creditors of the same priority be treated alike did not require simultaneous satisfaction); *In re Jewish Memorial Hospital*, 13 B.R. 417 (Bankr.S.D.N.Y.1981) (order authorizing payment of only some claims consistent with the flexibility required for reorganization and order does not establish priority within priority).

Decisional authority contrary to the *Chateaugay* holding is found in *In re FCX, Inc.*, 60 B.R. 405 (E.D.N.C.1986). The district court in *FCX* considered the issue of whether the bankruptcy court committed reversible error in authorizing the debtor, a farmers' purchasing and marketing cooperative, to pay pre-petition indebtedness arising from unpaid payroll expenses, unpaid payroll taxes and unpaid grain purchases. The district court held that the Code did not grant the bankruptcy court the power to authorize the payment of pre-petition indebtedness. The *FCX* court found that a bankruptcy court is not empowered to deviate from the Code's rules of priority and distribution in the absence of conduct on the part of a claimant which would justify equitable subordination pursuant to 11 U.S.C. § 510. The court stated:

This court finds that by authorizing the payment of pre-petition indebtedness arising from unpaid payroll expenses, unpaid payroll taxes, and unpaid purchases of grain, the Bankruptcy Court effectively subordinated the claims of the remaining unsecured creditors. Such subordination is not authorized under the law absent inequitable conduct on the part of these remaining unsecured creditors.

Section 507(a) does not set forth a priority of payment with respect to the claims authorized by the Bankruptcy Court. By subordinating the claims of the remaining unsecured creditors to these claims, the bankruptcy court has set up a priority within the class of general unsecured creditors not established

by Congress. Therefore, because there is always the possibility that FCX will not have sufficient assets to pay all general unsecured creditors, it is legally improper to subordinate the claims of the remaining unsecured creditors absent inequitable conduct by them.

. . . .

Appellee contends, however, that the court can equitably elevate certain claims if equity so requires. In support of this contention, FCX points to 11 U.S.C. § 105(a), which provides that the bankruptcy court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." This provision certainly confers equity powers upon the bankruptcy court, but it does not authorize it to create rights not otherwise available under applicable law.

60 B.R. at 410–11 (footnotes omitted).

The Fourth Circuit's recent decision in *Official Committee of Equity Sec. Holders v. Mabey*, 832 F.2d 299 (4th Cir.1987), also supports the proposition that a bankruptcy court is not vested with the power to authorize the payment of estate funds to unsecured claimholders in the pre-plan stage of a bankruptcy proceeding. In *Mabey*, the Fourth Circuit reversed an order of the district court which approved the establishment of an "Emergency Treatment Fund" by A.H. Robins Co. ("Robins"), a Chapter 11 debtor. The Emergency Treatment Fund was created to defray the cost of providing tubal reconstructive surgery or in-vitro fertilization for claimants who were injured by the Dalkon Shield, an intrauterine birth control device which had been manufactured and distributed by Robins. In approving the creation of the Emergency Treatment Fund, the district court stressed that § 105(a) of the Code granted the court expansive equity powers which could be drawn upon to support those steps needed to treat the Dalkon Shield claimants equitably. The court of appeals held that the establishment and funding of the Emergency Treatment Fund afforded Dalkon Shield claimants preferential treatment over general unsecured creditors, stating as follows:

While the equitable powers emanating from § 105(a) are quite important in the general bankruptcy scheme, and while such powers may encourage courts to be innovative, and even original, these equitable powers are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules.

. . . .

The Bankruptcy Code does not permit a distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved.... *The creation of the Emergency Treatment Program has no authority to support it in the Bankruptcy Code and violates the clear policy of Chapter 11 reorganizations by allowing piecemeal, pre-confirmation payments to certain unsecured creditors. Such action also violates Bankruptcy Rule 3021 which allows distribution to creditors only after the allowance of claims and the confirmation of a plan.*

832 F.2d at 302 (emphasis added) (footnotes omitted). Hence, like the *FCX* court, the Fourth Circuit articulated a restrictive view of a bankruptcy court's equity powers, holding that the payment of pre-petition claims may not be authorized pursuant to § 105(a).

As the foregoing discussion reveals, two divergent lines of authority have arisen with respect to the issue of whether a bankruptcy court is empowered to authorize a Chapter 11 debtor's payment of pre-petition claims. One line of authority, represented by the *FCX* and *Mabey* cases, holds that the Code does not permit selective pre-confirmation payments to unsecured creditors. However, *Chateaugay* and other decisions support the principle that a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of pre-petition claims where such payment is necessary to "permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately." *In re Chateaugay Corp.*, 80 B.R. at 287.

In resolving the issue at bar, the Court is not required to state definitively which line of authority it finds to be the more analytically sound. Like the *FCX* and *Mabey* courts, this Court believes that permitting the Chapter 11 debtor to selectively pay pre-petition indebtedness serves to create priorities among the general unsecured creditor body that are inconsistent with the distributive scheme envisioned by § 507. On the other hand, a *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code. The Court can conceive of rare instances in which the payment of a pre-petition debt may be absolutely vital to the reorganization of a Chapter 11 debtor. Such situations would necessarily involve a finding by the bankruptcy court that, absent payment of the pre-petition debt in question, the debtor's rehabilitative effort would be immediately aborted. Further, in such cases, the court should be convinced, on the basis of the record before it, that authorizing the payment of the pre-petition debt creates "the greatest likelihood of ... payment of creditors in full or at least proportionately." *See, In re Chateaugay Corp.*, 80 B.R. at 287.

Here, it has not been established that the exigencies of this case demand that the Court authorize payment of the pre-petition medical claims pursuant to § 105(a) of the Code. The Court understands that failure to pay the pre-petition medical claims may, regrettably, work a hardship upon many of the Debtor's employees. Although it will provide little solace to Structurlite's employees, it must be pointed out that the entire creditor body has been adversely impacted, at least temporarily, by the Debtor's filing of a Chapter 11 petition. Further, the fact that the productivity of the Debtor's work force may decline or that a strike may result due to non-payment of the pre-petition medical claims is not compelling. Selective re-payment of pre-petition debt should not be authorized as a result of threats or coercion by disgruntled creditors. Such activity is violative of the automatic stay imposed by 11 U.S.C. § 362(a) and, if tolerated, would negate the fundamental principle of equality of treatment among similarly situated creditors.

Additionally, the testimony adduced at hearing revealed that Structurlite had $300,000 in cash on hand, a portion of which could be utilized to pay the pre-petition medical claims. However, no evidence of the Debtor's net worth was offered to establish that there is a reasonable probability that Structurlite's general unsecured creditors will ultimately be paid in full, a factor which strongly influenced the decision of the *Penn Central* court and the bankruptcy court in *FCX* to authorize the payment of pre-petition claims. In short, on the basis of the record, the Court finds that it would not be appropriate to permit the payment of the pre-petition medical claims under authority of § 105(a).

■ Structurlite also urges the Court to approve payment of the pre-petition medical claims pursuant to 11 U.S.C. § 507(a)(4). Section 507(a)(4), which affords priority status to claims for contributions to employee benefit plans, provides as follows:

(a) The following expenses and claims have priority in the following order:

. . . .

(4) Fourth, allowed unsecured claims for contributions to employee benefit plans—

(A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) for each such plan, to the extent of—

(i) the number of employees covered by such plan multiplied by $2,000; less

(ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

The Trust Agreement is an "employee benefit plan" within the meaning of § 507(a)(4). *In re Saco Local Development Corp.*, 23 B.R. 644, 646–47 (Bankr.D. Me.1982). And, the sums owed by the

Debtor to the Trustees constitute "contributions" as that term is used in § 507(a)(4). *Id.* at 647. Thus, the Court is unopposed to the limited payment of pre-petition medical claims pursuant to the formula provided in § 507(a)(4). However, based upon the record made at hearing, the Court is unable to determine the specific amounts of pre-petition medical benefits which are properly payable under § 507(a)(4). First, the Court has not received evidence establishing the total number of employees of Structurlite covered by the Trust Agreement. Such information is necessary if the formula contained in § 507(a)(4) is to be applied. *See,* 11 U.S.C. § 507(a)(4)(B)(i). Second, § 507(a)(4)(B)(ii) provides that amounts paid to employees under the wage priority of § 507(a)(3) must be subtracted from the product obtained from multiplying the number of employees covered by the employee benefit plan by $2,000. On March 9, 1988, the Court entered an order authorizing the Debtor to pay pre-petition accrued payroll, vacation pay and sick-leave pay due to salaried and hourly employees. As stated above, the total of such payments which are entitled to priority under § 507(a)(3) must be determined before the calculation contemplated by § 507(a)(4) is undertaken. Here, the Court has not been presented with evidence establishing the total amount of § 507(a)(3) priority payments made by the Debtor under the Court's March 9, 1988, order. Until such information is of record, the Court cannot authorize further payments pursuant to § 507(a)(4). Finally, § 507(a)(4) contains a durational limitation providing that a claim for contributions to an employee benefit plan must arise "from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first...." The Court has not received evidence which would establish the portion of the unpaid contributions to the Trust which is attributable to benefit claims arising within 180 days from the petition date. Any claims arising outside this 180-day period are not accorded priority status and are to be paid as general unsecured claims.

To summarize, the Court has not received sufficient evidence to enable it to determine what amount of the pre-petition medical claims may be paid under authority of § 507(a)(4). Accordingly, the Court's denial of Debtor's Motion shall be without prejudice to its right to submit evidence establishing: (1) the total number of Structurlite employees covered by the Trust Agreement; (2) the total amount of § 507(a)(3) priority payments made by Structurlite under authority of this Court's March 9, 1988, order; and (3) the amount of unpaid contributions to the Trust attributable to claims arising within 180 days of the petition date. This evidence may be presented in any manner mutually agreeable to the parties, such as by affidavit. In the event that the parties desire that the evidence be presented in the context of an actual hearing, such a request may be made.

In accordance with the foregoing, the Motion for Authority to Assume Executory Contract and to Pay Pre–Petition Medical Claims shall be and is, hereby, DENIED.

IT IS SO ORDERED.