**In re STRUCTURLITE PLASTICS CORPORATION, Debtor.**

Bankruptcy Nos. 2–88–01236, 31–4371524.

United States Bankruptcy Court, S.D. Ohio, E.D.

July 28, 1988.

Reginald W. Jackson, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for debtor and debtor-in-possession.

Thomas R. Noland, Altick & Corwin, Dayton, Ohio, for Official Creditors' Committee.

Richard O. Wuerth, Lane, Alton & Horst, Columbus, Ohio, for The Central Trust Co.

Lawrence J. Hackett, Office of the U.S. Trustee, Columbus, Ohio.

## OPINION AND ORDER

R. Guy COLE, Jr., Bankruptcy Judge.

### I. *Preliminary Statement*

The following contested matters are before the Court for decision in this Chapter 11 case:

(1) The Motion for Payment of Priority Contributions to Employee Benefit Plan (the "Employee Benefit Motion") filed by Structurlite Plastics Corporation, the debtor and debtor-in-possession ("Debtor" or "Structurlite");

(2) The Motion for Payment of a Retainer ("Retainer Motion") filed by the Committee of Creditors; and

(3) The Motion to Compel Debtor-in-Possession to Comply with 11 U.S.C. § 1107(a)(1) and 704(7) ("Motion to Compel").

These matters were heard on July 19, 1988, and taken under advisement by the Court. In the interest of judicial economy, the Court hereby consolidates its decision on these matters.

Jurisdiction of this case is vested in the Court pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. These contested matters are core proceedings which the Court is empowered to hear and determine in accordance with 28 U.S.C. § 157(b)(1) and (2)(A). The following opinion constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### II. *Findings of Fact*

The parties have agreed to submit the Retainer Motion and the Motion to Compel to the Court for decision on oral argument. Therefore, no evidentiary record was made in support of these motions. With respect to the Employee Benefit Motion, the Court finds that the July 19 hearing was, in effect, a continuation of the previous hearing of April 7 which was held to consider essentially the same request for relief now pending before the Court—*i.e.*, Debtor seeks Court authority to pay certain pre-petition medical claims of its employees. Accordingly, the Court hereby adopts for purposes of determining the Employee Benefit Motion the findings of fact and conclusions of law made by the Court following the April 7 hearing. *See, In re Structurlite Plastics Corporation*, 86 B.R. 922, 17 B.C. D. 808 (Bankr.S.D.Ohio 1988) ("*Structurlite I*"). Additional testimony was provided at the July 19 hearing by Paul Hornbuckle, Operations Manager of the Debtor. According to Hornbuckle, the Debtor has the present ability to pay the $60,595.68 in pre-petition medical claims of its employees without jeopardizing Debtor's day-to-day operations. One method suggested by Hornbuckle which would not impair Structurlite's ability to pay on-going operating costs contemplates payment of the pre-petition medical claims in $4,000 weekly install-

ments. Hornbuckle also amplified his prior testimony regarding the decline in morale of the Debtor's work force as a result of non-payment of the pre-petition medical claims. Several Structurlite employees have been contacted by local medical facilities which have threatened to discontinue the provision of services to Debtor's employees unless outstanding medical bills are immediately paid.

### III. *Discussion*

#### A. *The Employee Benefit Motion*

The Debtor seeks Court authority to pay $60,595.68 in pre-petition medical claims. The entire $60,595.68 amount, Debtor asserts, is entitled to priority status under 11 U.S.C. § 507(a)(4). Hence, Debtor submits that, under the Court's decision in *Structurlite I,* all of the pre-petition medical claims may properly be paid. In order to pass upon the Employee Benefit Motion, an understanding of the Court's previous decision in *Structurlite I* is required.

In *Structurlite I,* the Court made three specific holdings:

(1) that the Trust Agreement executed by and between Structurlite and the trustees of the Structurlite Plastics Employee Benefit Trust was not an executory contract subject to assumption by the Debtor under 11 U.S.C. § 365;

(2) that the exigencies of the case did not demand that the Court order immediate payment of the pre-petition medical claims pursuant to 11 U.S.C. § 105(a); and

(3) the Court would permit payment of the portion of the pre-petition medical claims which were entitled to priority status under § 507(a)(4) upon submission of sufficient evidence to enable

the Court to apply the § 507(a)(4) formula.[1]

*Structurlite I,* 86 B.R. 922, 17 B.C.D. at 810–16. Based upon the arguments of counsel at the July 19 hearing, it is apparent that clarification of the Court's second and third holdings is in order.

■ With respect to the Debtor's request that the Court order payment of the medical claims under authority of § 105(a) of the Code, the Court recognized that, generally speaking, a bankruptcy court cannot permit selective, pre-plan distributions to unsecured creditors. Such distributions, if authorized, would deviate from the rules of priority and distribution set forth in the Code and thereby establish a ranking of priorities within priorities. *Structurlite I,* 86 B.R. 922, 17 B.C.D. at 814–15. Accordingly, payments to unsecured creditors in a Chapter 11 case usually should be made only by means of distribution under a confirmed plan of reorganization. *See, Official Committee of Equity Security Holders v. Mabey,* 832 F.2d 299, 302 (4th Cir.1987); *In re FCX, Inc.,* 60 B.R. 405, 410–11 (E.D.N.C.1986); *In re Revere Copper and Brass, Inc.,* 32 B.R. 577, 582 (Bankr.S.D.N.Y.1983). On the other hand, the Court stated as follows:

[There may be] "rare instances in which the payment of pre-petition debt would be absolutely vital to the reorganization of a Chapter 11 debtor. Such situations would necessarily involve a finding by the bankruptcy court that, absent payment of the pre-petition debt in question, the debtor's rehabilitative effort would be immediately aborted. Further, in such cases, the court should be convinced, on the basis of the record before it, that authorizing the payment of the prepetition debt creates 'the greatest

---

1. Section 507(a)(4), which affords priority status to claims for contributions to employee benefit plans, provides as follows:
   (a) The following expenses and claims have priority in the following order:
   ....
   (4) Fourth, allowed unsecured claims for contributions to employee benefit plans—
   (A) arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the

debtor's business, whichever occurs first; but only
   (B) for each such plan, to the extent of—
   (i) the number of employees covered by such plan multiplied by $2,000; less
   (ii) the aggregate amount paid to such employees under paragraph (3) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

likelihood of payment of creditors in full or at least proportionately.' " *Structurlite I,* 86 B.R. 922, 17 B.C.D. at 815 (citing *In re Chateaugay Corp.,* 80 B.R. 279, 287 (S.D.N.Y.1987)). Because it had not been established that the exigencies of the case required immediate payment of the pre-petition medical claims, the Court declined to authorize such payment. *Id.* The record made at the July 19 hearing likewise fails to demonstrate that payment of the pre-petition medical claims is "absolutely vital to reorganization" of the Debtor or that absent such payment, Structurlite's "rehabilitative effort would be immediately aborted." *Id.*

■ The third holding made by the Court in *Structurlite I* involved payment of the portion of the outstanding pre-petition medical claims which was entitled to priority status under § 507(a)(4) of the Code. The Court noted its lack of opposition to such payment. It is this portion of the Court's decision which may have been misunderstood by the parties. Clearly, § 507 of the Code provides no independent source of authority for a bankruptcy court to order payment of a pre-petition, unsecured claim: it merely establishes a system of priority for unsecured claims. The Court's decision to permit payment of the portion of the pre-petition medical expenses which would be accorded priority status under § 507(a)(4) was based upon the Committee's consent to such payment. Following the April 7 hearing, the Committee filed a post-hearing memorandum with the Court which stated:

> "The Creditors' Committee is agreeable to allowing payment up to the priority levels established under 11 U.S.C. § 507(a)(3) and (4) but not beyond that level as it would effectively subordinate the other unsecured creditors' claims without statutory authorization."

Committees' Post–Hearing Memorandum at 7. In addition, the Committee asked the Court to follow the case of *In re Columbia Packing Co.,* 35 B.R. 447 (Bankr.D.Mass. 1983), wherein the court permitted the payment of pre-petition wage and benefit claims up to the § 507(a)(3) and (4) priority

amounts prior to formulation of a plan of reorganization. Supplemental Brief of Committee at 1–2. Hence, the basis of the Court's decision to permit payment up to the § 507(a)(4) priority amount was the Committees' consent to such payment. Presumably, the Committee's consent to payment was based upon its determination that immediate payment would not prejudice the estate and its belief that the assets of the estate will be sufficient to pay all claims of a higher priority, including administrative expenses, in full. Apparently, the Committee has chosen to withdraw its consent to payment of the amount of the pre-petition medical claims which is entitled to priority under § 507(a)(4). With no mention of its previous position, the Committee now argues that, because the Debtor has failed to demonstrate exigent circumstances, payment up to the § 507(a)(4) priority level should not be authorized.

■ Having considered the respective arguments of the Debtor and the Committee, the Court hereby finds the Employee Benefit Motion to be well-taken. As noted above, the exigencies of this case clearly do not militate in favor of payment of the pre-petition medical claims under authority of § 105(a) of the Code. However, two pleadings filed by the Committee—its Post–Hearing Memorandum and Supplemental Brief—plainly state the Committee's consent to payment of the priority portion of the pre-petition medical claims. The third holding of *Structurlite I* was premised upon the Committee's consent to payment. More importantly, the Debtor has relied upon the Committee's consent and, hence, the third prong of *Structurlite I,* in filing the instant Employee Benefit Motion along with the affidavits containing the information necessary for application of the § 507(a)(4) formula. In fairness, the Committee may not now withdraw its consent. Such consent is in the nature of a stipulation and the Committee has offered no cause for the Court to grant it relief from such stipulation. Indeed, no substantive reason for the Committee's reversal of position has been stated. Under the circumstances, basic fairness and equity demand that the Committee be held to its

original position. Accordingly, the Employee Benefit Motion shall be GRANTED. Debtor shall make payment of the $60,595.68 in pre-petition medical claims in weekly installments of no more than $4,000.

## B. *The Retainer Motion*

The Committee seeks an order of this Court requiring the Debtor to pay counsel for the Committee a retainer of $20,000. According to the Committee, payment of a retainer may be ordered under authority of 11 U.S.C. § 328(a), which states in relevant part:

[A] committee appointed under Section 1102 of this title, with the Court's approval, may employ or authorize employment of a professional person under Section 1102 of this title as the case may be, on any reasonable terms and conditions of employment, including a retainer....

In addition to its reliance upon § 328(a), the Committee's request is based on the following grounds:

(1) Committee counsel has expended in excess of $10,000 of hourly services to the Committee; however, the Committee cannot seek interim compensation under § 331 of the Code until 120 days after an order for relief has been entered;

(2) Debtor is seeking to pay pre-petition claims of a lesser priority than 11 U.S.C. § 507(a)(1) administrative expenses; and

(3) The operating reports filed with the Court establish that the Debtor had a mere $67,000 in cash on hand as of April 30, 1988.

Based upon the foregoing, the Committee states: "the Court should fashion a remedy to protect the § 507(a)(1) costs and expenses of the committee and its counsel." Motion for Payment of a Retainer at 4. Alternatively, the Committee seeks an order of this Court authorizing it to share in the retainer paid by the Debtor to its counsel. Both the Debtor and The Central Trust Company ("Central Trust"), the primary secured creditor in this case, oppose the Retainer Motion.

The Committee's Retainer Motion is susceptible to summary disposition. The Committee has not cited, nor is the Court independently aware of, authority supporting what is, in effect, an involuntary retainer procedure. Simply because § 328(a) permits a professional employed by a creditors' committee to receive a retainer, it does not necessarily follow that a retainer may be extracted from a debtor against its wishes. Neither the letter nor the spirit of the Code's professional compensation scheme recommends such a procedure. The other grounds asserted by the Committee in support of the Retainer Motion are equally uncompelling. At the time he accepted employment, counsel for the Committee clearly was aware of the fact that § 331 requires a 120–day waiting period before interim compensation may first be awarded. Further, counsel for the Committee has now filed his first interim fee application (which shall be noticed for hearing in due course) and, hence, a significant delay in payment of the Committee's counsel fees appears unlikely. The Committee also cannot be heard to complain about payment of lesser priority claims, namely the pre-petition medical claims. As discussed above, the Committee consented to such payment. Finally, the Debtor's less-than-secure cash position fails to convince the Court that payment of a retainer is warranted. Experienced bankruptcy counsel, in accepting appointment, realize the existence of a risk that compensation may be foregone if the assets of the estate ultimately prove to be insufficient to pay administrative expenses.

The Committee's proposal to share in the retainer received by counsel for the Debtor at the inception of this case must also be rejected. As the bankruptcy court in *In re Kinderhaus Corp.*, 58 B.R. 94, 97 (Bankr D.Minn.1986) noted:

"A prepetition retainer held in trust by a debtor's attorney to compensate for services to be rendered and costs to be incurred during the pendency of the bankruptcy case is not ordinarily available as a source of payment for other administrative expense claims under 11

U.S.C. § 503(b), except to the extent that trust funds might remain after full and final compensation has been allowed a debtor's attorney in whose favor the trust was created."

In short, the Retainer Motion is unsupportable and is, therefore, DENIED.

### C. *The Motion to Compel*

The Committee also requests the Court to enter an order compelling the Debtor to comply with its fiduciary duties as a debtor-in-possession. According to the Committee, the Debtor's failure to comply with its fiduciary duties has effectively precluded the Committee from exercising its statutory powers and duties pursuant to 11 U.S. C. § 1103. The Committee's complaints are essentially two-fold: (1) the Debtor has failed to meet with the Committee since the filing of the Chapter 11 petition in violation of the mandatory duty imposed by 11 U.S. C. § 1103(d); and (2) the Debtor has not furnished the Committee with sufficient information regarding a potential sale of substantially all of the assets of Structurlite. With regard to its second area of concern, the Committee specifically requests that drafts of proposed sale agreements between the Debtor and prospective purchasers be made available to it. Each of the Committee's complaints shall be addressed below.

■ Plainly, the Code imposes a duty upon a debtor-in-possession to meet with the Committee as soon as practicable after its appointment to "transact such business as may be necessary and proper." 11 U.S. C. § 1103(d). With respect to the matter of a meeting between Debtor and the Committee, the oral arguments of counsel presented differing versions of the relevant facts. According to counsel for the Debtor, the Committee has made no effort to schedule a formal meeting with the Debtor. The Committee rejoins by stating that it is the Debtor's duty to arrange such a meeting. It is not necessary for the Court to dwell at length on what is a seemingly inconsequential scheduling dispute between counsel. The Debtor, by operation of § 1103(d), has a mandatory duty to meet with the Committee. If the Court is presented with *evi-*

*dence* establishing an unreasonable failure by the Debtor to comply with a request by the Committee for a meeting, an order compelling the Debtor to comply with § 1103(d) will issue and appropriate sanctions shall be imposed. The Court strongly urges the parties to resolve this matter without the need for further judicial intervention.

The parties' dispute regarding the Committee's request for information pertaining to a proposed sale of substantially all of the Debtor's assets requires an examination of the proper role of a creditors' committee in the Chapter 11 reorganization process. Resolution of this issue calls for an analysis of 11 U.S.C. § 1103(c), its accompanying legislative history and the decisional law interpreting this subsection.

Section 1103(c) of the Bankruptcy Code delineates the functions of a creditors' committee. Such functions include:

(1) consulting with the debtor-in-possession concerning the administration of the case;

(2) investigating the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;

(3) participating in the formulation of a plan, advising those represented by such committee of such committee's determinations as to any plan formulated, and collecting and filing with the court acceptances or rejections of a plan;

(4) where appropriate, requesting the appointment of a trustee or examiner under 11 U.S.C. § 1104; and

(5) performing such other services as are in the interest of those represented.

The drafters of the Bankruptcy Code clearly envisioned a prominent role for creditors' committees in the reorganization process:

[C]ommittees will be the primary negotiating bodies for the formulation of the plan of reorganization. They will represent the various classes of creditors and equity security holders from which they

are selected. They will also provide supervision of the debtor in possession and of the trustee, and will protect their constituents' interests.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 401, 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6357. *See also, In re Penn–Dixie Industries, Inc.*, 9 B.R. 941, 944 (S.D. N.Y.1981) (A committee has a "wide and important array of authority and responsibility ... [and] the Bankruptcy Code contemplates a significant and central role for committees in the scheme of a business reorganization.").

■ Whether a committee, in carrying out its functions under § 1103(c), is entitled to review drafts of proposed asset sale contracts between a debtor-in-possession and a prospective purchaser is an issue which has not been addressed in a reported decision. This is not surprising: the proper role of the committee in a Chapter 11 reorganization is necessarily a factual inquiry to be determined on a case-by-case basis. Nevertheless, the parameters of a committee's involvement in the reorganization process have been established by the case law. As a preeminent commentator has noted, a creditors' committee's functions do not include an involvement in the debtor-in-possession's day-to-day operations:

> [S]ection 1103(c)(1) authorizes a committee to "consult with" the debtor, it does not authorize the committee to "operate" the debtor's business. Committees appointed under section 1102 may make recommendations concerning the debtor's business but a committee should not attempt to displace the persons who are legally responsible for management of the debtor's financial affairs. In the case of a debtor corporation, the board of directors is responsible for management of the debtor. If the officers and directors of a debtor corporation are unwilling or incapable of managing the debtor's business, a committee, as a party in interest, should make an application under section 1104(a) for the appointment of a trustee.
>
> A committee should not attempt to usurp control itself. It should be noted, however, that in making recommendations to management of the debtor corporations concerning operation, the committee does not assume management responsibility for the affairs of the debtor. In the case of a debtor corporation, such responsibility remains with the board of directors until a trustee is appointed.

5 *Collier on Bankruptcy* ¶ 1103.07 at 1103–21 (15th ed. 1988). While a committee's functions do not encompass an operational role, clearly the most important aspect of a committee's functions is to negotiate the terms of a plan of reorganization. H.R.Rep. No. 595, 95th Cong., 1st Sess. 402, 1978 U.S.Cong. & Admin.News 5787, 6357; *In re Johns–Manville Corp.*, 801 F.2d 60, 62 (2d Cir.1986) ("[T]he [committee's] power to exercise a voice in the formulation [of a plan] is clearly a desideratum under the program laid down by the Bankruptcy Code...."). *See also, In re Saxon Industries, Inc.*, 39 B.R. 945, 947 (Bankr.S.D.N.Y.1984); *In re Pettibone Corp.*, 74 B.R. 293, 309 (Bankr.N.D.Ill. 1987).

■ Thus, on one hand, the committee should not become involved in the management of the debtor-in-possession's financial affairs. On the other hand, participation in the formulation of a plan represents the foremost of a committee's functions. With these principles serving as decisional guideposts, the Court will turn to the instant dispute. Plainly, negotiation concerning the sale of substantially all of the assets of the Debtor is an activity which is more closely akin to plan formulation than the conduct of day-to-day business operations. As such, the Committee should be provided with sufficient information to evaluate and take a position on the potential sale of Structurlite's assets. *See, In re McLean Industries, Inc.*, 70 B.R. 852, 860 (Bankr.S. D.N.Y.1987) ("[C]ommittee is ... to be given notice of, and is expected to respond to, various requests ... on which committee position is crucial, such as sales of property out of the ordinary course of business."). *See also, Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir.1983).

Does the Committee's participatory role include a right to review drafts of proposed sale agreements? Determination of this question requires the balancing of the relative benefits and detriments which would flow from such an arrangement. The Committee contends that it must have access to the drafts of sale contracts in order to fully evaluate the proposed transactions and their effect on the estate and the creditor body. Without access to the drafts, the Committee argues, it will be unable to formulate a position with respect to the proposed transactions in a timely manner. According to the Debtor, information regarding the proposed sale transactions may be supplied to the Committee without the necessity of actually transmitting drafts of proposed contracts to the Committee for review. On balance, the Court finds the Committee's position to be meritorious. The Committee has asserted a valid reason to support its request to review the draft documents: absent access to such draft agreements, it will not have sufficient time to formulate an informed position on the proposed sales. In response, the Debtor has offered no compelling reason to preclude the Committee from reviewing the draft agreements. No evidence was adduced indicating that the Comittee's access to the documents in question would chill a sale by dissuading potential purchasers from negotiating with the Debtor. Accordingly, the Court finds the Committee's Motion to Compel to be well-taken, and hereby, GRANTS the same.

Based upon the foregoing, the Court ORDERS as follows:

(1) The Motion for Payment of Priority Contributions to Employee Benefit Plan is hereby GRANTED;

(2) The Motion for Payment of a Retainer is hereby DENIED; and

(3) The Motion to Compel Debtor-in-Possession to Comply with 11 U.S.C. § 1107(a)(1) and 704(7) is GRANTED.

IT IS SO ORDERED.