832 F.2d 299
 56 USLW 2282, 17 Collier Bankr.Cas.2d 1210,
16 Bankr.Ct.Dec. 1109, Bankr. L. Rep. P 72,013
 The OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS, Plaintiff-Appellant,
v.
Ralph R. MABEY, Examiner; A.H. Robins Company,
Incorporated; Legal Representative for the Future
Tort Claimants; Dalkon Shield
Claimants' Committee,
Defendants-Appellees.
 No. 87-3842.
 United States Court of Appeals,
Fourth Circuit.
 Submitted Oct. 7, 1987.
Decided Nov. 3, 1987.
 
 Robert Michael Miller, James MacNeil Nolan, Berlack, Israels & Liberman, New York City, on brief, for plaintiff-appellant.
 John S. Kinzey, Peter A. Ivanick, Lynn A. Dummett, Leboeuf, Lamb, Leiby & MacRae, New York City, James C. Roberts, Mays & Valentine, Richmond, Va., Dennis J. Drebsky, Skadden, Arps, Slate, Meagher & Flom, New York City, Murray Drabkin, Mark C. Ellenberg, Eleanor Pelta, Cadwalader, Wickersham & Taft, Washington, D.C., Stanley Knight Joynes, III, Rilee, Cantor, Arkema & Edmonds, Richmond, Va., on brief, for defendants-appellees.
 Before RUSSELL and CHAPMAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 CHAPMAN, Circuit Judge:
 
 
 1
 This is an appeal arising from the Dalkon Shield litigation in the A.H. Robins Co. Chapter 11 bankruptcy proceedings. The Official Committee of Equity Security Holders (Equity Committee) appeals the May 21, 1987 order of the district court which directed
 
 
 2
 that the Debtor shall, within sixty (60) days of this date, establish an emergency treatment fund in the sum of Fifteen Million Dollars ($15,000,000.00) for the purpose of assisting in providing tubal reconstructive surgery or in-vitro fertilization to eligible Dalkon Shield claimants on the terms and conditions set forth in paragraphs 12 through 23 of said motion as if fully set out in this Order.
 
 
 3
 The clerk was directed to forward notice of the program to approximately one hundred eighty thousand people who have filed timely notice of a claim and responded to the Court Questionnaire. Paragraphs 12 through 23 of the motion set forth in detail the Emergency Treatment Program which will provide funds for tubal reconstructive surgery or in-vitro fertilization for Dalkon Shield claimants who have asserted that they have been rendered infertile as a consequence of their use of the product. The Program names an administrator, who "may employ others to assist in the administration of the program." It also creates a court appointed medical expert agreeable to the Dalkon Shield Claimants' Committee and a court appointed medical expert agreeable to Robins. These two medical experts shall agree upon a third expert to be appointed by the court to make any medical decisions required under the Program and further provides that the court may appoint "a nationally recognized fertility institute to make all eligibility and other medical determinations." The Program is to be financed by a Fifteen Million Dollar fund to be set aside by Robins in an interest bearing account. The Program is to be audited by an accounting firm approved by the court; the administrator, experts and others employed in connection with the Program will be compensated as allowed by the court, and the program will "be terminated prior to or superseded by a confirmed plan of reorganization and all unexpended funds will be reallocated as provided by a confirmed plan of reorganization."
 
 
 4
 The Program also sets out the eligibility requirements for claimants seeking treatment or surgery. Payment will be made directly to the doctor and hospital and no money will be paid directly to the claimant or her attorney. Any amounts paid under the Program on behalf of a participating claimant will be deducted from the amount of disbursement the claimant would otherwise receive under a confirmed Chapter 11 plan of reorganization of Robins.
 
 
 5
 We find that the establishment and funding of the Program would benefit only certain unsecured holders of Dalkon Shield claims and that the program would afford preferential treatment to such claimants over other similarly situated unsecured Dalkon Shield claimants and over general unsecured creditors. The disbursement of such funds prior to the confirmation of a plan of reorganization for Robins would violate the Bankruptcy Code. We, therefore, reverse the district court.
 
 
 6
 * The history of this litigation is well known and will not be repeated in detail. A.H. Robins Co. is operating its business as a Debtor in possession pursuant to the Bankruptcy Code, having filed a voluntary petition for relief under Chapter 11. The United States District Court for the Eastern District of Virginia, Richmond Division, retained jurisdiction of certain aspects of this bankruptcy, including the Dalkon Shield litigation and claims. In September 1985 the district court ordered the appointment of The Official Committee of Equity Security Holders to represent the interest of Robins public shareholders. The common stock of Robins is traded on the New York Stock Exchange. There are more than twenty million shares of common stock outstanding.
 
 
 7
 Robins sought refuge in Chapter 11 because of a multitude of civil actions filed against it by women who alleged they were injured by use of the Dalkon Shield intrauterine device. As a result of the District Court's Bar Date Order of November 21, 1985, and worldwide notice of the effect of this order, approximately 325,000 notices of claim have been filed against Robins in the Bankruptcy Court alleging Dalkon Shield injuries. Robins and the Equity Committee have challenged the validity and amount of many of these claims, and none of these alleged Dalkon Shield claims have yet been "estimated" pursuant to 11 U.S.C. 502(c) or "allowed" pursuant to 11 U.S.C. 502(a).
 
 
 8
 In April 1987 Robins filed a proposed plan of reorganization and shortly thereafter filed a proposed disclosure statement. No action has been taken on the proposed plan of reorganization because of a merger proposal submitted by Rorer Group, Inc. under which Dalkon Shield claimants would be compensated out of a $1.75 billion fund and all other creditors would be paid in full. Robins' stockholders would receive stock of the merged corporation. As a result of the merger proposal a revised plan of reorganization and disclosure statement must be filed, but, as of the date of the district court's order creating the $15 million "Emergency Treatment Fund", a revised plan of reorganization had not been submitted nor confirmed.
 
 
 9
 On August 13, 1986, the court appointed Ralph R. Mabey as an examiner "to evaluate and suggest proposed elements of a plan of reorganization." Examiner Mabey together with Robins, the Dalkon Shield Claimants' Committee and the Future Claimants' Representative filed the motion seeking the establishment of the Emergency Treatment Fund. In this motion they assert that one kind of injury allegedly caused by the Dalkon Shield is infertility, and that a number of claimants alleging such infertility are candidates for tubal reconstructive surgery or in-vitro fertilization. The program provides:
 
 
 10
 A claimant is considered a candidate for reconstructive surgery if: (a) she is less than 40 years old; (b) she claims infertility; and (c) she is not surgically infertile.
 
 
 11
 It is alleged that the rate of success in restoring fertility by reconstructive surgery is thirty percent to sixty percent in cases where proper screening techniques have been utilized. The cost of such surgery runs $10,000-$15,000. It is further stated "upon information and belief, in-vitro fertilization may be effective in certain cases in which tubal reconstructive surgery is unlikely to be successful."
 
 The motion further states:
 
 12
 If we assume that a Dalkon Shield claimant who has a compensable infertility claim would receive at least Fifteen Thousand Dollars under any plan of reorganization, the net financial cost of the program should not exceed the sum of the program administrative expenses and the time value of the monies disbursed. In effect, a participating claimant is simply electing to take a portion of her ultimate distribution in the form of medical assistance now rather than cash later. (However, if the claim of a participant is ultimately disallowed under a plan of reorganization, or valued at Fifteen Thousand Dollars or less, the claimant, while not being required to repay any amounts paid on her behalf for reconstructive surgery, will receive no additional distribution.)
 
 II
 
 13
 The May 21, 1987 order of the district court approving the Emergency Treatment Fund makes no mention of its authority to establish such a fund prior to the allowance of the claims of the women who would benefit from the fund, and prior to the confirmation of a plan of reorganization of Robins. However, in its order denying The Equity Committee's Motion for a Stay Pending Appeal of the May 21, 1987 order, the district court relied upon the "expansive equity power" of the court.
 
 
 14
 The court recognizes that the establishment of an emergency treatment fund is unusual and, indeed, may be unprecedented. Nevertheless, the Code provides the Court, pursuant to Sec. 105(a) with an expansive equity power to 'issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.' 11 U.S.C. Sec. 105(a). The dire circumstances of this case required the Court to invoke its power under Section 105(a) and take those steps needed to treat these claimants equitably. See also Midlantic Nat'l Bank v. New Jersey Dept. of Envt'l Protection, 474 U.S. 494 [106 S.Ct. 755, 88 L.Ed.2d 859] (1986).
 
 
 15
 We have searched Midlantic[1] without finding any reference to the equitable powers under Sec. 105(a), and we find such decision has no relevance to the issues presently before us. While the equitable powers emanating from Sec. 105(a) are quite important in the general bankruptcy scheme, and while such powers may encourage courts to be innovative, and even original, these equitable powers are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules. In the Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company, Debtor, 791 F.2d 524, 528 (7th Cir.1986) the court stated
 
 
 16
 the fact that a proceedings is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be.
 
 
 17
 The same rule was stated earlier by Judge Augustus Hand in Guerin v. Weil, Gotshal & Manges, 205 F.2d 302, 304: (2d Cir.1953).
 
 
 18
 Although it has been broadly stated that a Bankruptcy Court is a court of equity (citation omitted), the exercise of its equitable powers must be strictly confined within the prescribed limits of the Bankruptcy Act.
 
 
 19
 While one may understand and sympathize with the district court's concern for the Dalkon Shield claimants, who may desire reconstructive surgery or in-vitro fertilization, the creation of the Emergency Treatment Fund at this stage of the Chapter 11 bankruptcy proceedings violates the clear language and intent of the Bankruptcy Code, and such action may not be justified as an exercise of the court's equitable powers under 105(a).
 
 
 20
 The Bankruptcy Code does not permit a distribution to unsecured creditors in a Chapter 11 proceeding except under and pursuant to a plan of reorganization that has been properly presented and approved. 11 U.S.C. Sec. 1121 provides for the filing of a plan of reorganization. Sections 1122-1129 set forth the required contents of a plan, the classification of claims, the requirements of disclosure of the contents of the plan, the method for accepting the plan, any modification thereof, the hearing required on confirmation of the plan and the requirements for confirmation. The clear language of these statutes, as well as the Bankruptcy Rules applicable thereto, does not authorize the payment in part or in full, or the advance of monies to or for the benefit of unsecured claimants prior to the approval of the plan of reorganization. The creation of the Emergency Treatment Program has no authority to support it in the Bankruptcy Code and violates the clear policy of Chapter 11 reorganizations by allowing piecemeal, pre-confirmation payments to certain unsecured creditors. Such action also violates Bankruptcy Rule 3021[2] which allows distribution to creditors only after the allowance of claims and the confirmation of a plan.
 
 III
 
 21
 On appeal the appellees for the first time raised a question of standing of the Equity Committee. This position is as unsupported as it is untimely. 11 U.S.C. Sec. 1109(b) provides:
 
 
 22
 A party in interest, including the debtor, the trustee, the creditors' committee, the equity security holder's committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this Chapter.
 
 
 23
 The appellant falls within the clear language of this section, and it also has a real and substantial pecuniary interest in the disbursement of $15 million prior to the confirmation of a plan.
 
 
 24
 Equally without merit is the appellees claim that the order of the district court establishing the Emergency Treatment Fund was justified under what it refers to as a "business judgment" standard. We can find no support for such a standard, and if such a standard does exist, it would not allow the court to violate the clear dictates of the Bankruptcy Code, by paying certain unsecured claimants before their claims have been allowed and before a confirmed plan of reorganization is in place.
 
 
 25
 REVERSED.
 
 
 
 [1]
 Midlantic at F.N. 2 states:
 The sole issue presented by these petitions is whether a trustee may abandon property under Sec. 554 in contravention of local laws designed to protect the public's health and safety.
 
 
 [2]
 Rule 3021--Distribution under Plan
 After confirmation of a plan, distribution shall be made to creditors whose claims have been allowed, to holders of stock, bonds, debentures, notes, and other securities of record at the time of commencement of distribution whose claims or security interests have not been allowed and to indenture trustees who have filed claims pursuant to Rule 3003(C)(5) and which have been allowed.