**In re SHARON STEEL CORPORATION, et al., Debtor.**

**PENSION BENEFIT GUARANTY CORPORATION, Movant,**

**v.**

**SHARON STEEL CORPORATION, United Steelworkers of America and Citibank, N.A., as Agents, Respondents.**

Motion No. TR & A–2.
Bankruptcy Nos. 92–10958, 92–10959 and 92–10961.

United States Bankruptcy Court, W.D. Pennsylvania.

Oct. 8, 1993.

Herbert P. Minkel, New York City, for debtor.

Stephen Karotkin, New York City, William H. Schorling, Pittsburgh, PA, for Citibank, N.A., as Agent.

Philip E. Beard, Pittsburgh, PA, Mark Shapiro, New York City, for Official Committee of Unsecured Creditors.

Leonard F. Spagnolo, Pittsburgh, PA, Richard A. Pearson, and Melinda Tell Lazare, Washington, DC, for Pension Benefit Guar. Corp.

Richard E. Gordon, Pittsburgh, PA, for United Steelworkers of America.

Robert Wayne, Pittsburgh, PA, for Mueller Industries, Inc.

Shawn Riley, Cleveland, OH, for Cleveland Cliffs.

## OPINION [1]

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

By Memorandum and Order dated September 24, 1993, we fixed an evidentiary hearing for September 29, 1993 to afford the Pension Benefit Guaranty Corporation ("PBGC") an opportunity to present evi-

---

**1.** This Opinion constitutes this Court's findings   of fact and conclusions of law.

dence in support of its Motion for Stay Pending Appeal ("Motion"). The PBGC had filed an appeal from this Court's Order dated September 21, 1993 by which we approved an agreement ("Agreement") between Sharon Steel Corporation ("Debtor") and the United Steelworkers of America ("USWA").

The Agreement provides that the USWA will cease picketing and facilitate the orderly sale and shipment of the Debtor's steel inventory. In return, the Debtor agrees to reserve 6% of the gross proceeds realized from the sale of the steel inventory to pay certain prepetition wage claims of the USWA members.

The PBGC, which holds a junior lien on certain of the Debtor's fixed assets, but which does not hold a lien on the Debtor's inventory, objects to the payment of prepetition wage claims in the absence of a finding under 11 U.S.C. § 363(e) that the PBGC is adequately protected.

We determined from the argument of counsel, without the benefit of an evidentiary hearing, that the savings generated by the orderly liquidation of the Debtor's inventory with the cooperation of the USWA out-weighed the payment of 6% of the sales price to prepetition wage claimants and that the Agreement is a benefit to all parties including the PBGC.

Following the evidentiary hearing on the PBGC's Motion, at which we heard Malvin Sander, Esq., General In-house Counsel to the Debtor, James T. Wood, a steel marketing expert, and Gary Nietupski, Esq., a labor lawyer, our prior conclusion has been reaffirmed and we find that a stay is not warranted.

### Facts

The Debtor has 95,000 tons of steel inventory with a present market value in the range of $20–24 million dollars. Citibank, in a separate complaint which would be settled by the Agreement, alleges that the USWA has engaged in unlawful picketing, amounting to a seizure of the Debtor's plant. Citibank might well be successful in obtaining an injunction to stop any illegal picketing, but lawful picketing would continue. Picketing renders the Debtor unable to conduct business; it is, in effect, paralyzed due to such picketing. The Debtor has been unable to even remove trash from its premises.

If the picketing were limited by an injunction, the problem would remain. Potential customers are intimidated by pickets and will be deterred from visiting the Debtor's premises to determine if they have an interest in the purchase of the Debtor's inventory. Union haulers will not cross picket lines to effect shipment. There is a shortage of non-union haulers willing to cross a picket line in order to deliver the Debtor's inventory. Haulers who will cross a picket line charge a higher price due to the increased risk. Without the Agreement, the Debtor will suffer substantial delays in the disposition of its inventory. Substantial delays equate to substantial deterioration in net realizable value and substantial increased costs.

In the meantime, the Debtor is incurring approximately $200,000 per month in interest on the $20 million dollar value of its inventory. The Debtor has 25,000 tons of steel stored in warehouses in the Sharon area. It continues to incur storage charges. The warehouse owners will refuse to ship across picket lines, even with an injunction in place. They are unwilling to risk their property and equipment.

To date, there has been no physical violence on the picket lines. The Debtor has not attempted to violate the picket lines. However, were the Debtor to obtain an injunction and attempt to make shipment, the risk of violence increases. There is a risk of physical harm because of the unfortunate circumstances.

The workers have some fundamental complaints which cannot be lightly disregarded. They produced the goods in inventory which the Debtor, the banks and PBGC seek to sell. But the workers did not get paid for their last few weeks' work before the plant shutdown. Now, they have not worked in nearly a year and they see the inventory which they produced, being sold for the sole benefit of the banks

and PBGC as lienholders. It is not hard to see why picket lines appeared.

The upward pressures on the price of steel which have existed over the past year have dissipated. The steel market is presently flat and may see price decreases in the future.

In the absence of the Agreement, the Debtor risks a reduction in the sales price of its inventory, deterioration in the quality of inventory (much of which is stored outside), added security costs, added transportation costs, a potential deterioration in the value of its facilities due to the inability to winterize the facility and to maintain compliance with environmental regulations.

Even with an injunction against the USWA and its members, security is threatened by lawful pickets which would remain and by the antagonistic atmosphere which would prevail.

The additional costs which will be borne by the Debtor in the absence of the Agreement far exceed the $1.5 million cost of paying prepetition wages under the Agreement. PBGC is correct, however, in asserting that once the money is distributed to prepetition wage claimants, it would be difficult to recover.

By Opinion and Order dated April 23, 1993, 159 B.R. 165, we determined that the liquidation value of all of the Debtor's assets was $138.9 million and that the total secured debt at that time was $130 million, leaving $8.9 million in equity. Since that time, the Debtor has continued to incur interest obligations, professional fees, and the expense of maintaining its facilities in a non-operating mode. Thus, while it has had little or no income, it has incurred substantial expense. It is not known at the present time whether any equity remains. The effect of making a finding that the PBGC is adequately protected under § 363(e) as PBGC requests is to grant it a superpriority claim under § 507(b) in the event that its collateral is insufficient to pay its claim in full. In effect, the PBGC would be entitled to payment on any deficiency claim ahead of all other administrative claimants of which there would be many, including the professionals in this case, without whom there could be no hope of a reorganization.

### Discussion

#### Standard for Granting Stay Pending Appeal

■ The parties agree that the factors which must be considered when determining whether to grant a stay pending appeal are:

1. whether the movant has made a showing of likelihood of success on the merits,

2. whether the movant has made a showing of irreparable harm if the stay is not granted,

3. whether the granting of the stay would substantially harm other parties, and

4. whether the granting of the stay would serve the public interest.

See e.g., In re First South Savings Assn., 820 F.2d 700 (5th Cir.1987); In re Grand Traverse Dev. Co. Ltd. Partnership, 151 B.R. 792 (W.D.Mich.1993); In re Gleasman, 111 B.R. 595 (Bankr.W.D.Tex.1990).

Each of the four conditions must be satisfied, but all of the conditions need not be given equal weight. In re Leibinger–Roberts, Inc., 92 B.R. 570 (E.D.N.Y.1988); In re Great Barrington Fair and Amusement Inc., 53 B.R. 237 (Bankr.D.Mass. 1985). Fed.R.Bankr.P. 8005 provides, in part, that "the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest." Rule 8005 gives the Court the flexibility to fashion appropriate relief to fit the needs of a particular case. In re Gleasman, 111 B.R. at 600. The four factors referred to above are to be balanced in light of the overall circumstances of the case. Grand Traverse, 151 B.R. at 796.

■ As we discuss below, the granting of a stay would result in substantial harm to the Debtor and the PBGC has not shown that it will suffer any injury if the stay is

not granted. Further, it is unlikely that the PBGC will succeed on the merits of its appeal and the unnecessary delay in administration of this estate is contrary to the interests of every party involved in this case.

### Likelihood of Success

The PBGC does not disagree with the sale of the Debtor's inventory or the method of sale proposed by the Debtor. We regard this as the key to the issue before us. The PBGC objects only to the payment of prepetition wage claims unless the Court makes a finding that the PBGC is adequately protected or provides the PBGC with some form of adequate protection.

11 U.S.C. § 363(e) provides:

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sole, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

In order to have a claim to adequate protection, the PBGC must have an interest in the property that the Debtor seeks to sell. The Debtor and the Official Committee of Unsecured Creditors assert that the PBGC has no lien on the Debtor's steel inventory and, therefore, has no right to adequate protection.

The PBGC holds a lien on the fixed assets of the Debtor's Farrell, Pennsylvania facility (the "Farrell Fixed Assets"). The PBGC lien is *pari passu* with liens held by the USWA and Cleveland Cliffs. The three *pari passu* liens are junior to a lien held by a group of lenders represented in this case by Citibank, N.A., as agent (collectively, "Citibank"). Citibank has a first position lien on substantially all of the Debtor's assets, including the steel inventory. The PBGC does not have a lien on the steel inventory.

Under the terms of the Agreement, 6% of the proceeds from the sale of the Debtor's steel inventory will be used to pay prepetition wage claims. Absent the Agreement, the 6% would be used to reduce Citibank's claim, thus reducing Citibank's reliance on the Farrell Fixed Assets to satisfy a portion of its claim and freeing the Farrell Fixed Assets for satisfaction of the PBGC lien. Therefore, we find that the PBGC has an "interest" as required by § 363(e) in the sale of the Debtor's steel inventory.

Under § 363, the Court is required to prohibit or condition "such ... sale ... as is necessary to provide adequate protection." Therefore, we must determine whether and to what extent adequate protection is necessary. We find that adequate protection is unnecessary in the within case. While it is true that 6% of the sale price will be used to pay claims lower in priority than the PBGC's lien claim, the evidence is also clear that, should the Agreement not be approved and a stay be granted which delays the sale of the inventory, the value of the inventory and of the Farrell Fixed Assets will diminish by an amount greater than 6%.

The concept of adequate protection is based on the requirement that the collateral of a secured creditor be protected from erosion in value. Here, the prompt sale of the steel inventory will enhance the value of PBGC's collateral. Since the value of PBGC's collateral will not be diminished, a finding of adequate protection is unnecessary. It is therefore unlikely that the PBGC's appeal will succeed on the merits.

### Risk of Harm

Prior to reaching the Agreement with the USWA, members of the USWA maintained a picket line at the Debtor's premises, essentially paralyzing the Debtor's operations. Customers were unable or unwilling to visit the Debtor's facilities to view the product and haulers were not able or were unwilling to transport the product for delivery. The Debtor was even unable to remove trash from its facility! Not only could the Debtor not ship its product, it could not receive materials needed to win-

terize the facility or to maintain compliance with environmental regulations.

Some of the Debtor's inventory is stored in warehouses in the Sharon area. The warehouse owners refused to make shipments for fear of harm to their facilities and equipment.

The PBGC suggests that the Debtor obtain an injunction to stop the picketing. An injunction may stop unlawful picketing. However, lawful picketing cannot be prohibited. The Debtor's customers would still be forced to cross a picket line to view the Debtor's product and union haulers would still refuse to effect shipment.

The Debtor may be able to obtain some non-union haulers to make some shipments. Due to the risk of crossing the picket line, the cost would be increased. Further, it is unlikely that enough haulers could be found to enable the Debtor to make timely shipments to its customers and avoid delay. Potential customers would know that they could not depend on delivery schedules. Even with an injunction, the warehousemen would not allow shipments from their facilities. The risk of harm remains present.

Without the Agreement, the Debtor faces continued delay in the sale of its inventory. Substantial portions of the inventory are stored outside and will suffer deterioration if it remains exposed to the elements through the winter. The upward pressure on price of steel has dissipated. The market has been flat over the summer. It is not likely that prices will increase in the near future. There is, however, a considerable risk that prices will decline. A minimal 10% loss in the value of the Debtor's inventory from deterioration in the product or decline in market prices would exceed $2.0 million dollars.

In addition to lost value on inventory, should the Debtor attempt to make shipment in the face of picketing by the USWA, the Debtor would necessarily incur substantial additional expense for security. During any delay in accomplishing sale of the inventory, the Debtor continues to incur interest expense on Citibank's loan. The total expense and losses the Debtor will incur in the face of delay far exceed the approximately $1.5 million payment to prepetition wage claimants under the Agreement.

Critical to our conclusion is the fact that PBGC has neither offered nor suggested any alternative means of liquidating Debtor's 95,000 tons of steel inventory worth an estimated $20–24 million. PBGC has filed a conditional consent or a conditional objection to the Agreement, offering to allow the sale of inventory to proceed if its junior lien on other assets is given some additional priority position. PBGC asserts that it is being hurt by the proposed method of sale, but does not suggest any alternative.

While approval of the Agreement will involve some $1.5 million in costs, the net return to the estate from the sale of the inventory under the Agreement will be (we conclude from the evidence as a matter of fact) much higher than if the Agreement is not approved. We also conclude that PBGC and its representatives are fully aware of this fact and agree with these factual conclusions.

■ PBGC and its representatives know that if it manages to block the Agreement now under consideration that the net return from the inventory will be far less. Notwithstanding that belief, the PBGC and its representatives have interposed the objection to the Agreement and the sale thereunder as a tactical maneuver in an attempt to force other parties in the case to give up or compromise their legitimate positions. For example, the PBGC, as a solution, suggests that the USWA give up its right to picket. Our view is that the USWA has a constitutional right to picket. These workers unfortunately worked for a period of weeks without pay just prior to the plant shutdown. The plant has been shut down now for nearly a year. Not only have the workers lost their jobs due to the shutdown, but their last few weeks' pay was never paid. They have a constitutional right to express their displeasure over the sale of the inventory which may benefit others in the case and yet leave the wages go unpaid. They have a constitutional right to express their views by picketing.

We could not order the pickets to disband and cooperate with the sale of the goods against their wishes.

Also, PBGC suggests that senior lienholders subordinate their senior lien positions in order to pay proceeds to the PBGC as a junior lienholder. We know of no law that would require or allow us to undertake such an action without the consent of the senior lienholders. Moreover, the senior lienholders are made up not just of the bank lenders led by Citibank but also by numerous other lienholders who were not present to even be asked to give up their liens.

If the PBGC and its representatives could offer us an alternative means of liquidating the inventory which would yield more to all parties concerned, all parties would be eager to examine and accept it. However, the PBGC offers us no such assistance.

PBGC wants the goods to be sold and agrees that the method of sale is the best that can be devised, but it wants to use the circumstance of the USWA picketing to bargain for a priority position over administration expenses in the event there are any unencumbered assets at the end of the case, or a priority position over senior lienholders.

We do not view the matter before us as involving the deprivation of a right of PBGC. We also believe that PBGC concurs. It concurs because it has not even made a suggestion as to a better way to market the inventory. It, in effect says, "give us someone else's share in addition to our own, or we will attempt to stop the sale—even if we harm the Debtor's estate to the detriment of everyone." We do not regard the PBGC position as being taken in good faith.

Our conclusion is that the PBGC objection to the Agreement is made in a bad faith effort to obtain concessions from senior lienholders and administrative claimants, under a threat that a portion of the value of the Debtor's assets will otherwise be destroyed by delay. PBGC will suffer no harm in the absence of a stay, while the bankruptcy estate would be exposed to a substantial loss in the value of its inventory and incur additional expense if a stay is imposed.

### Public Interest

While the public certainly has an interest in seeing that the PBGC, as the insurer of the majority of the pension plans in this country, is protected, the citizens of the Sharon, Pennsylvania area have an equally significant interest in seeing one of its major employers reorganize.

Since we have determined that the PBGC will suffer no harm as a result of. the approval of the Agreement, we think that this prong of the test also weighs in favor of denial of the stay.

### Payment of Prepetition Wages

■ The PBGC asserts that it is improper to allow the payment of prepetition wage claims prior to plan confirmation. There is a split of authority with respect to the issue of whether we are empowered to authorize a Chapter 11 debtor's payment of prepetition claims. The line of cases suggested by the PBGC, represented by *Official Committee of Equity Security Holders v. Mabey*, 832 F.2d 299 (4th Cir.1987), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988) hold that the Bankruptcy Code does not permit selective preconfirmation payments to unsecured creditors. Other courts hold that the "necessity of payment" doctrine is a narrow exception to the rule prohibiting such payments, where the payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code. *See e.g., In re NVR L.P.*, 147 B.R. 126 (Bankr.E.D.Va. 1992); *In re UNR Industries, Inc.*, 143 B.R. 506 (Bankr.N.D.Ill.1992); *In re Eagle–Picher Industries, Inc.*, 124 B.R. 1021 (Bankr.S.D.Ohio 1991).

As stated in *NVR L.P.*, 147 B.R. at 128: To justify the pre-plan payment of a prepetition obligation the proponent of the payment must show substantial necessity. By definition, the "necessity of payment" rule is a rule of necessity and not one of convenience. For example, some courts have stated the payment must be "critical to the debtor's reorganization," "indispensably necessary" to continuing the debtor's operation, or "necessary to

avert a serious threat to the Chapter 11 process." In short, the payment must not only be in the best interest of the debtor but also in the best interest of its other creditors. See In re UNR Industries, Inc., 143 B.R. 506, 520 (Bankr. N.D.Ill.1992); Eisenberg & Gecker, The Doctrine of Necessary and Parameters, 73 Marq.L.Rev. 1, 20 (1989). (footnotes omitted)

The Third Circuit has adopted the "necessity of payment" doctrine. *In re Lehigh and New England Ry. Co.*, 657 F.2d 570 (3d Cir.1981).

To justify payment of 6% of the sales price of the Debtor's inventory to prepetition wage claimants, the Debtor is required to show that the payment is necessary to avert a serious threat to the Chapter 11 process. The Debtor has met that burden.

The failure to allow the Agreement to take effect will result in an immediate economic sanction (*e.g.*, picketing of the Debtor's facilities), which will impair the Debtor's ability to conduct operations—including the sale and delivery of its inventory which is essential to its eventual reorganization.

At this point in the Debtor's case, its most significant operation is the liquidation of its steel inventory and other non-essential assets with the goal of resolving the claims of Citibank. Only then will the Debtor be in a position to propose a plan of reorganization which addresses the claims of its other creditors.

Approval of the Agreement and the payments to the Debtor's prepetition wage claimants contemplated thereby will increase rather than diminish the amounts realizable by the Debtor from the sale of the steel inventory. As a result, the secured position of the PBGC will be enhanced rather than harmed. The Agreement will permit the Debtor to liquidate the inventory at its maximal value and, thus, resolve a greater portion of Citibank's claims at an earlier time, thereby reducing the interest on such claims and their impact on the Debtor's estate and any eventual plan of reorganization.

In the absence of the Agreement, if the Debtor attempts to sell its inventory, there is a danger that a test of wills between the Debtor and members of the USWA could result in damage to the Debtor's property and a risk to the health and well-being of the Debtor's employees and members of the USWA who will attempt to prevent shipments of inventory and will result in the incurrence of additional costs relating to potential litigation and the need to protect the Debtor's facilities.

### Conclusion

The PBGC is not entitled to adequate protection in connection with the sale of the Debtor's inventory and the Agreement. The "necessity of payment" doctrine justifies the Agreement and the payments contemplated thereby. The PBGC has failed to demonstrate a likelihood of success on appeal and failed to show that it will suffer any harm in the absence of a stay. The Debtor, on the other hand, has demonstrated that the harm it will suffer if a stay is imposed far exceeds the amount of payment made to prepetition wage claimants under the Agreement.

The PBGC's Motion will be refused.