**In re MMR HOLDING CORPORATION,
Debtor.**

**MMR HOLDING CORPORATION,
et al., Plaintiff,**

**v.**

**C & C CONSULTANTS, INC., Defendant.**

**Bankruptcy Nos. 90–00395,
90–00396 to 00403.
Adv. No. 92–00018.**

United States Bankruptcy Court,
M.D. Louisiana.

Dec. 20, 1996.

John M. Landis, New Orleans, Louisiana, for Plaintiff.

Leonce G. Gautreaux, IV, Baton Rouge, Louisiana, for Defendant.

### REASONS FOR DECISION

LOUIS M. PHILLIPS, Bankruptcy Judge.

This matter comes before this Court on cross-motions for summary judgment. For the reasons stated below, this Court grants summary judgment in favor of the defendant, C & C Consultants, Inc., and denies summary judgment to plaintiff, the debtor (MMR).

#### Background

Prior to MMR's bankruptcy filing, MMR retained C & C Consultants, Inc. (C & C) to provide engineering consultant services and litigation support services to MMR's attorney in connection with the prosecution by MMR of a construction contract claim against SMS Concast, Inc. (the Concast Claim). On or about February 15, 1990, within ninety days prior to the filing of its bankruptcy petition, MMR issued a check to C & C in the amount of $9,888.73, as payment of two C & C invoices dated July 5, 1989, and August 19, 1989. Between February 15, 1990 (the date of the payment at issue), and MMR's bankruptcy filing (on March 28, 1990), C & C provided additional consulting services to MMR on the Concast Claim, for which MMR was billed $13,800.

The MMR/SMS Concast, Inc. construction contract was one of several bonded contracts for which Aetna Casualty and Surety Company (Aetna) had issued performance bonds.

As part of a global resolution of the claims, contract rights, indemnity obligations, need for post-petition financing, and the issue of assumption or rejection of these bonded construction contracts, MMR, by Order dated May 1, 1990, assumed all of its bonded construction contracts, including the contract between MMR and Concast, and assigned these contracts to Aetna. Along with the assignment of the MMR/Concast contract went the Concast Claim.

As part of the assignment consideration, MMR retained, in certain of the assigned contracts, including (as one of the "completed" contracts) the MMR/Concast contract, a residual interest which was delineated within the order of assumption and assignment as follows:

> ... the net proceeds (and receivables or payments of any kind related to work, extras or otherwise on these contracts) after resolving all claims by, and all claims against, the Debtors shall be handled as follows:
>
> a.  The calculation described herein shall be on a completed contract by completed contract basis, with Aetna calculating and remitting the amounts described herein as each completed contract with all its related claims and counterclaims is completely resolved.
>
> b.  The net of all claim and counterclaim proceeds (and receivables or payments of any kind related to work, extras or otherwise on these contracts) shall first be used to repay any Aetna payments, costs of performance, or expenses on such job that was originally scheduled as "completed", (sic) but which, in fact, required any Aetna payments or performance.
>
> c.  Against the resulting balance shall be deducted all costs of prosecution, evaluation, preparation, litigation, pursuit, compromise, settlement, dismissal, or other resolution of such claims on that job.
>
> d.  The resulting net balance shall be divided 50% to Aetna and 50% to the Debtors' estates.

The stipulated facts establish that the MMR/Concast Claim was one subject to this provision of the assumption and assignment order. In further explication of the obligation of Aetna, as assignee and obligor of the 50% net residual interest, the assumption/assignment order goes on to state:

> 3.  Aetna shall have the exclusive and unilateral discretion for the prosecution, pursuit, litigation, arbitration, dismissal, compromise, release, settlement, defense, preparation, or resolution of any kind of all claims and counterclaims on every bonded contract, and its obligation to remit 50% of the net proceeds shall not create any duties or obligations to any other party other than the duty of such 50% remittance. The authority of Aetna shall include (by way of illustration but not limitation) the right to engage, direct and discharge counsel to prosecute the claims upon such terms as are appropriate; the right to incur such claims or litigation costs as may be appropriate; the right to sign all documents or papers as may be necessary to effectuate its authority herein; and any other authority necessary to effectuate this order.

The stipulated facts establish that subsequent to the assignment by MMR of the MMR/Concast contract to Aetna, Aetna paid monies to C & C for litigation support in connection with the Concast Claim, including the $13,800 worth of post–February 15, 1990, pre–March 28, 1990, invoices. Aetna settled with Concast, and MMR was provided credit for its 50% interest in the residual profit in amount in excess of $2,000,000.

According to the complaint, the $9,888.73 payment was a preference. According to a joint stipulation filed by the parties, the $9,888.73 payment meets all of the § 547(b) criteria, and therefore was a preferential transfer. The resulting dispute, as framed by the parties, therefore, is over the application of the exception to preference recovery

set forth in 11 U.S.C. § 547(c)(4) (the subsequent advance of unsecured credit defense).[1]

Emanating from this focus by the parties is the following question: whether payment by Aetna of the $13,800 worth of new value given by C & C prepetition obviates the protection of § 547(c)(4).

## DISCUSSION

### General Application of § 547(c)(4) and the Effect of Repaying New Value

There has been within the jurisprudence an unnecessary turbulence concerning § 547(c)(4), brought about (probably) by too many law clerks writing too many opinions unbridled. The problem? Whether the new value extended subsequent to the preference must (for all time, one supposes) remain unpaid for the advance to qualify as a subsequent advance for purposes of offsetting preference liability. *See Kroh Bros. Dev. Co. v. Continental Constr. Eng'rs, Inc. (In re Kroh Bros. Dev. Co.)*, 930 F.2d 648, 652 (8th Cir.1991); *Boyd v. The Water Doctor (In re Check Reporting Services, Inc.)*, 140 B.R. 425, 432–34 (Bankr.W.D.Mich.1992), and cases cited therein.

Not too long ago, the Fifth Circuit laid rest to the purported problem (which has never been a problem within this Court, given the unambiguous wording of § 547(c)(4)) in *Lak-er v. Vallette (Matter of Toyota of Jefferson, Inc.)*, 14 F.3d 1088 (5th Cir.1994). In this case the Fifth Circuit lucidly analyzed the statute which clearly allows a defendant to offset against preference liability, advances of new value given after a preference, if the advance is

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

By logical extension, the question is not whether a subsequent advance remains unpaid, but whether, if paid, it was paid by means of a transfer which was itself avoidable, or not. If the transfer on account of or after the new value is itself avoidable, then § 547(c)(4) insulates, to the extent of the new value, the preference which preceded it. Why? It is easy to see. The § 547(c)(4) exception merely requires the substitution of the subsequent avoidable transfer for the preceding one (of course, if there is never a transfer on account of the new value, this issue never arises), except that any portion of the preceding preference in excess of the amount of new value is added to the payment made subsequent to the new value, to get the resulting aggregate preference. For example:

| Preference | New Value | Avoidable Transfer Subsequent to Extension of New Value | Resulting Preference |
|---|---|---|---|
| 1,000 | 600 | | 400 |
| | | 500 | 500 |
| | | Total of Preference | **900** |

If the $500 transfer is not avoidable, or is secured by an unavoidable security interest, then the new value which can be used to offset the preference is reduced by the $500 payment, so that the preference is calculated as follows:

| Preference | New Value | Unavoidable Transfer on Account of New Value | Resulting Preference |
|---|---|---|---|
| 1,000 | 600 | | 400 |
| | | 500 (added back against | 500 |
| | | new value offset) | **900** |

---

1. Section 547(c)(4) reads as follows:

    (c) The trustee may not avoid under this section a transfer—

    .  .  .  .  .

    (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

    (A) not secured by an otherwise unavoidable security interest; and

    (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

Surprise! The resulting preference exposure is the same, whether the $500 transfer on account of the new value is or is not avoidable. Why? Mathematically, the result is inexorable. Reduction of the new value by the extent that a subsequent transfer is unavoidable merely reflects the reduced extent to which the estate has gained from the new value.

█ If the transfer on account of new value is not itself avoidable, the reduction is applied to the new value offset resulting in the same net preferences as if the post-new value transfer is itself avoidable so as to be added to any remaining preference not offset by the new value. The math works hand-in-hand with the policy underlying § 547(c)(4), that is to give creditors credit against preferences to the extent they have repaid them. If the transfer on account of the new value is not itself avoidable, then it cannot be said that the estate has received the full value of the new value, because something has been given back on account of it, and therefore the preference must be recalculated after the reduction in new value.

In summation, if the new value is repaid or secured by an unavoidable transfer, reduce the new value by the extent of the unavoidable transfer. This increases the preference by the extent of the unavoidable post-new value transfer. If the new value is repaid, secured or followed by an avoidable transfer, the preference is increased by this amount after giving full credit for the new value. Either way, the resulting preferences comes out the same.

This is how it works, and it is not so difficult.

So the question here is not whether the $13,800 was paid, but whether any payment *by the debtor* on account of the $13,800 was unavoidable. To the extent of an unavoidable payment by the debtor, the new value should be reduced. However, in this case the ease of assertion belies some degree of complexity.

### *This Particular Case—Post–Petition Payment By the Debtor and/or by a Party Other Than the Debtor*

Recall that the debtor assigned all of its interest in the bonded contracts to Aetna, subject only to the obligation of Aetna to remit one-half of the net recovery from the "completed contracts." C & C points this out and argues that because Aetna paid (as opposed to the debtor), the estate was not diminished. There is also at least an intimation that because the payment was post-petition, it shouldn't count.

█ Regarding the question of whether a post-petition payment should always be discounted as a factor in § 547(c)(4) analysis, this Court would point out, for example, that a post-petition transfer on account of prepetition new value which is avoidable under § 549 should not reduce the applicability of the new value offset, as the post-petition avoidable transfer will simply replace the portion of the prepetition preference which is offset by the new value (see the analysis above). It simply does not matter that the avoidable transfer subsequent to the extension of new value is a pre- or post-petition avoidable transfer. Avoidable is avoidable. However, what about an *unavoidable* post-petition transfer? Should the analysis not yield the same consequences as delineated above (*i.e.*, reduce the new value available for offset)?

█ An unavoidable post-petition transfer on account of new value extended subsequent to a preference *should* limit the use of § 547(c)(4) by the amount of the unavoidable transfer, as without a reduction in the new value offset, the transferee would be receiving double use of the new value (once as consideration for the unavoidable transfer which effects a dollar-for-dollar reduction, and once as an offset to the prior preference which would also reflect a dollar-for-dollar reduction). There is no requirement within § 547(c)(4) which limits the universe of facts to be considered to those arising prepetition.

Here, clearly, the post-petition payment to C & C was unavoidable, given the assumption/assignment order. However, was it a payment by the debtor or Aetna? This question itself requires brief discussion. Payment by a third party might well constitute an indirect payment by the debtor, if, say, a third party owed the debtor money and instead paid a creditor. Because such a post-petition payment would probably be avoidable pursuant to § 549, the new value exception probably works, given the substitution of one avoidable transfer for another.[2] If the preferred creditor, though, obtains payments from, say a third party such as a co-debtor, the payment is probably not avoidable, but it is also not from the debtor—all that has happened is that now the debtor, having obtained the benefit of the new value, owes someone else for it. Therefore, if the transfer, though non-avoidable, is not a transfer from the debtor, there should be no reduction of the new value offset (see § 547(c)(4) which refers to the debtor not making an otherwise unavoidable transfer to or for the benefit of the creditor). What, though, of the unavoidable transfers, post-petition, by the debtor? Well, if this Court is correct (that there should be no difference between a pre- or post-petition avoidable transfer), there is

no difference between an unavoidable prepetition and unavoidable post-petition transfer, for purposes of application of § 547(c)(4). At first blush it seems as though an unavoidable transfer by the debtor, post-petition, should result in a reduction of the new value preference offset.

Here, the debtor retained a one-half (½) interest in the net recovery of the Concast Claim as part of the consideration of the agreement underlying the overall assumption and assignment order. Therefore, mathematically, the debtor authorized Aetna to use its one-half (½) of the recovery from which to pay expenses associated with litigating the Concast Claim.

To explain, it is clear that had Aetna not paid the $13,800, then the net recovery of $4,191,674, associated with the Concast Claim, would have been increased by $13,800, of which the debtor and Aetna would have each taken $6,900. Therefore, and MMR touched on this, it might be that the $13,800 new value should be reduced by $6,900 (13,800 ÷ 2 = 6,900) as that portion of the payment by Aetna was attributable to the debtor's residual interest in the claim. If this is the way it should go, the calculation is as follows:

| Preference | New Value | Unavoidable Transfer on Account of New Value | Resulting Preference |
|---|---|---|---|
| 9,888.73 | 13,800 | 6,900 | 2,988.73 (13,800–6,900 = 6,900; 9888.73–6,900 = 2,988.73) |

Because MMR has already suffered application of the new value (as a full offset against the preference), it should not have to suffer both full offset and unavoidable transfer on account of the new value. MMR would be paying twice (as far as § 547(c)(4) is concerned).

This brings us to a question. How could a debtor make a post-petition transfer, on ac-

count of a prepetition debt, that is not avoidable unless there is some security interest requiring use of estate property? Oh, one supposes that there must be some way it could happen—say, for example, if a court would allow some emergency payment to prepetition creditors, *see, e.g. In re C.A.F. Bindery, Inc.*, 199 B.R. 828 (Bankr.S.D.N.Y. 1996); *Pension Benefit Guaranty Corp. v.*

**2.** The applicable part of § 549 reads as follows:
  **§ 549. Postpetition transactions**
    (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
      (1) that occurs after the commencement of the case; and

      (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
      (B) that is not authorized under this title or by the court.

*Sharon Steel Corp. (In re Sharon Steel Corp.),* 159 B.R. 730 (Bankr.W.D.Pa.1993); *In re NVR L.P.,* 147 B.R. 126 (Bankr. E.D.Va.1992); *In re UNR Industries, Inc.,* 143 B.R. 506 (Bankr.N.D.Ill.1992); *In re Eagle–Picher Industries, Inc.,* 124 B.R. 1021 (Bankr.S.D.Ohio 1991); *In re Chateaugay,* 80 B.R. 279 (S.D.N.Y.1987); *In re Lehigh and New England Ry. Co.,* 657 F.2d 570 (3rd Cir.1981), which is an example not without problems (such as that several courts have expressly precluded such; *see In re Structurlite Plastics Corp.,* 86 B.R. 922 (Bankr. S.D.Ohio 1988); *Official Committee of Equity Security Holders v. Mabey,* 832 F.2d 299 (4th Cir.1987); *In re FCX, Inc.,* 60 B.R. 405 (E.D.N.C.1986)). Also, § 549 carries within it exceptions to avoidability,[3] but none that appear applicable here.

There is one section of the Bankruptcy Code that expressly provides the authority for a debtor or trustee to make unavoidable payments on account of prepetition claims which are not secured by non-avoidable security interests, and which, without the court-authorized payments, would generally rise only to the status of general unsecured claims. That section is § 365(b), the provision that not only authorizes but requires that prepetition defaults be cured before an executory contract can be assumed.[4]

If a debtor-in-possession or trustee wants the asset part of a contract, the debt side must be performed. It takes no great elasticity of imagination to conclude that most parties to executory contracts whose prepetition defaults are cured as a precondition to assumption get more on a pro rata basis than do other unsecured creditors, or than they would receive if the contract was not assumed. Does this deplete the estate with respect to its ability to maximize distribution to the group? Well, from the claim-side perspective, yes. However, there are two sides. There is also the asset-side perspective. What the estate gets for what it pays for is greater in value to the whole (one

---

**3.** The applicable provisions of 11 U.S.C. § 549 reads as follows:

.    .    .    .    .

(b) In an involuntary case, the trustee may not avoid under subsection (a) of this section a transfer made after the commencement of such case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

(c) The trustee may not avoid under subsection (a) of this section a transfer of real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed, where a transfer of such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to the interest of such good faith purchaser. A good faith purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected.

.    .    .    .    .

**4.** 11 U.S.C. § 365(b)(1) and (b)(2) reads as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

hopes) than what the estate would keep by not paying out but not obtaining the asset side.

■ How does this suggestion fit within the matter before the Court? This Court is trying to get at the question of whether or not a preference, in fact, existed, notwithstanding the factual stipulation of the parties that the $9,888.73 transfer met all the § 547(b) criteria of preferential transfer. The factual stipulation seems, frankly, at odds with the facts. What if MMR, by virtue of the assumption/assignment order also transferred the estate's rights to assume any contract which existed as a satellite to the assigned construction contract, or granted Aetna status as its agent, with respect to its one-half residual interest, to assume such agreements as within its discretion Aetna determined should be assumed? If this right was granted or this relationship established, then presumably Aetna could assume the satellite contract, cure defaults, and maintain the obligations under the contracts. MMR agreed to abide by Aetna's decision in this regard and to pay one-half of the expenses as part of the consideration for retaining the residual 50% of the net recovery. Certainly, the language of the assumption and assignment order can be read to contemplate just such a process. Further, such an interpretation makes practical sense, in light of the situation which existed at the time of the order.

Very shortly after the filing of the case, it became clear that the MMR bonded contracts, as a whole, could not be performed. Testimony taken close in time to the date of the order suggested that Aetna, as the issuer of the performance bonds, stood to lose upwards of $60,000,000 per month for every month it was barred (by § 362 and/or § 365) from taking over performance of the body of bonded work. Given the terms of the indemnity provisions of the bond agreement, therefore, a corresponding claim would arise against the estates (of the then not substantively consolidated debtors). As part of an overall settlement of the indemnity claims and the assumption/rejection issues (extent

of default, need to cure, ability to perform, right of the debtor to retainage in connection with "completed contracts," right of debtor to prosecute construction contract "claims" where performance was completed, *etc.*), MMR effectively transferred its 50% residual interest in the "completed" contracts, from which Aetna could draw assistance (as it deemed necessary) to pay expenses necessary (in its business judgment) to the effectuation of recovery of the final monies in these cases. There is no limitation within the assumption/assignment order that the expenses payable before the 50/50 split be post-petition expenses. In fact, there is no limitation whatsoever, except for a reservation by MMR, after the fact, to analyze the payments before finally settling up with Aetna.[5]

Of course, the order says this. If Aetna is becoming the assignee of the contract claims by virtue of the assignment of the contracts, it should be able to exercise its discretion to keep on board the experts, litigation support consultants, *etc.* with whom MMR had been previously working (so as not to have to reinvent the wheel). This decision is a classic example of the exercise of business judgment, *i.e.*, "what will it cost to hire new people versus what will it cost to bring old ones current and how will the proponents of recovery be affected in this right by the decision?"

■ The facts establish that the prepetition amounts due C & C were paid by Aetna before calculation of the MMR residual 50% of net recovery (presumably so was post-petition billing). This fact clearly manifests a decision by Aetna to use its business judgment to maintain the prepetition agreement between MMR and C & C. Because MMR effectively transferred its ability to assume the C & C contract to Aetna, or put another way, granted Aetna the authority to act on MMR's behalf up to its 50% share of the net recovery, and because Aetna did so by maintaining the C & C contract, this Court finds that the C & C contract was effectively assumed with MMR's permission, subject to Aetna and MMR having to split the bill

---

5. This was done, and as established by the stipulated facts, the Concast claim generated over $4,000,000 of net recovery, to be split, or credited, 50/50.

50/50. With this act of assumption, the basis for the preference claim evaporates; the agreement has been assumed by the estate, which has caused the prepetition obligation to be a post-petition obligation (subject, as mentioned, to Aetna helping pay). The curing of default requirement obviates the bringing of the preference action, as the right to preference recovery must be a factor analyzed in the calculation by which the decision to assume is reached. Given this, either the action as a matter of law cannot be brought, or § 547(b)(5) cannot be met.[6] Assumption presumes curing all prepetition default, and the act of assumption must be grounded, at least in part, in the conclusion that maintenance of the contract is more beneficial to the estate than doing without the other party's services, retaining the post-petition amounts payable under the contract, recovery of the preference, and the resulting unsecured claims against the estate having to be thrown into the mix. Given this, it is probably more particularly correct to frame the concept as follows: prepetition payments, which might otherwise be recoverable as preferences, are not recoverable preferences if the contract upon which the payments are based is assumed pursuant to § 365, as the estate cannot simultaneously become administratively obligated for all amounts due under an assumed contract (both pre- and post-petition) and recover for the estate payments made pursuant to the contract. Without going further, it can be said without qualification that the act of assumption precludes the application of § 547(b)(5), as this provision requires the hypothetical undoing of a pre-petition transfer which has been ordered "done" (and thereby not subject to undoing, either hypothetically or in reality) by means of the court's order of assumption. Loss of the use of § 547(b)(5) results, necessarily, in loss of the preference action.[7]

In essence, MMR, to extricate itself from an immense indemnity obligation and at the same time to obtain post-petition financing and a residual interest in "completed contracts," transferred to Aetna the right to assume such satellite contracts as it deemed necessary to obtain profit from the completed jobs, and earmarked its 50% net recovery right as obligated for one-half of such costs, before recovery of its share.

C & C was one such contracting party with whom Aetna determined to stay bound. Upon Aetna's decision to stay bound, MMR became bound. With the de facto assumption, the preference action evaporated. Therefore, though the foray into the applicability of § 547(c)(4) defense has been interesting (at least to this Court), in the end it is seen to be irrelevant. The factual stipulation, at odds with the facts before the Court, must be overridden by those facts. The complaint will, by separate order, be dismissed.

---

**6.** Section 547(b)(5) requires a showing that:
   (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

   (5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**7.** This Court draws support for its conclusions from the following cases: *Matter of Superior Toy and Manufacturing Company, Inc.,* 78 F.3d 1169 (7th Cir.1996); *Alvarado v. Walsh (In re LCO Enterprises),* 12 F.3d 938 (9th Cir.1993); *Seidle v. GATX Leasing Corp.,* 778 F.2d 659 (11th Cir. 1985). These cases stand for the proposition that § 365 assumption and § 547(b) recovery are mutually exclusive, upon basically the same reasoning asserted here.